**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| **BARNEY RONALD FULLER, JR.,#999481** | § | |
| | § | |
| *Petitioner,* | § | |
| **v.** | § | **Civil Action No. 9:15-cv-15** |
| | § | **JUDGE RON CLARK** |
| **DIRECTOR, TDCJ-CID,** | § | |
| | § | |
| *Respondent.* | § | |

PETITIONER, BARNEY RONAL FULLER, JR.'S
PETITION FOR WRIT OF HABEAS CORPUS

JASON D. CASSEL
Texas State Bar No. 24006970
jdc@emafirm.com
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
Telephone: (903) 757-8449
Facsimile: (903) 758-7397

## Table of Contents

PROCEDURAL HISTORY .................................................................................................. 5

STANDARD OF REVIEW ................................................................................................. 5

STATEMENT OF FACTS .................................................................................................. 6

   A.   Introduction.................................................................................................................. 6

   B.   Jury Selection and Pre-Trial........................................................................................ 7

   C.   Guilty Plea ................................................................................................................... 8

   D.   New Evidence in the State Habeas Proceedings......................................................... 10

CLAIMS FOR RELIEF ..................................................................................................... 10

   Claim No. 1.......................................................................................................................... 10

Mr. Fuller was incompetent to plead guilty, to stand trial for capital murder, or to defend himself
    against the imposition of death as a sentence. The trial of an incompetent capital defendant
    offends the Due Process Clause of the Fourteenth Amendment, the right to counsel of the
    Sixth Amendment and the heightened reliability requirement of the Eighth Amendment.
    The trial also violated Mr. Fuller's constitutional rights in failing to suspend the trial
    proceedings and hold a hearing on competency in the face of clear evidence of Mr. Fuller's
    decompensating mental state .................................................................................................. 10

   Claim No. 2.......................................................................................................................... 13

Mr. Fuller's trial  counsel was ineffective at the pre-trial and trial phases, in failing to investigate,
    discover, prepare and present substantial evidence of behalf of his client, including evidence
    of his client's innocence of the crime of capital murder, as well evidence that would have
    enabled competent mental health professional to form a reliable opinion as that Mr. Fuller
    was not competent to plead  guilty or stand trial for capital murder or to defend  himself
    against the imposition of the death  penalty. The resulting trial violated Mr. Fuller's rights
    under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S. Constitution.
    These errors constitute structural defects for which  prejudice is presumed; additional, the
    record establishes that, but for such errors, there is a reasonable probability that the trial
    would have been different................................................................................................... 13

   Claim No. 3.......................................................................................................................... 17

Petitioner Fuller was mentally incompetent and  the trial court failed to sufficiently admonish Mr.
    Fuller to assure that the record contained evidence that he fully understood the
    constitutional protections he was waiving.   Therefore his guilty plea must be considered
    involuntary and a violation of *Boykin v. Alabama*, *Brady v. United States* and the Self-
    Incrimination Clause of the Fifth Amendment and the Due Process Clause of the 14th
    Amendment............................................................................................................................ 17

   Claim No. 4.......................................................................................................................... 20

The admission of the confession from Mr. Fuller taken the morning of his arrest while he was still
    intoxicated and represented by an attorney who had instructed the sheriff not to interview
    Mr. Fuller violated  his  right to remain silent and right to counsel  under the Fifth, Sixth and
    Fourteenth  Amendments  to the U.S. Constitution. ........................................................... 20

Claim No.5.................................................................................................... 27

The performance of Petitioner's trial counsel was deficient in that they waived the presumption of innocence and the requirement that all the elements of guilt, [including a voluntary act and mens rea], be proved beyond a reasonable doubt by advising Petitioner to enter a plea of guilty. Petitioner, a chronic alcoholic and cocaine addict was prejudiced by the waiver because there was evidence readily available that Petitioner was unconscious of true reality and entertaining a delusion he thought was real at the time of the killings. ......................... 27

Claim No.6.................................................................................................... 29

Trial counsel provided ineffective representation at the sentencing phase of the trial in failing to investigate, develop and then present to the sentencing jury important mitigating information and evidence regarding the circumstances of Petitioner's background and upbringing that would likely have caused at least one juror to vote for a life sentence rather than a death sentence. ...................................................................... 29

Claim No. 7.................................................................................................... 41

Death may not be imposed on Mr. Fuller because his sentencing hearing was rendered fundamentally unfair and unreliable because of the junk science used to establish that he would be a continuing threat to society and lacked sufficient mitigating circumstances to warrant a life sentence rather than a death sentence. [Due Process Clause of the Fourteenth Amendment, Eighth Amendment reliability]........................................ 41

Claim No. 8.................................................................................................... 42

The performance of Mr. Fuller's trial counsel was deficient in any perceived failures to raise or adequately preserve complaints about the admission of junk science evidence used to establish that he would be a continuing threat to society and lacked sufficient mitigating circumstances to warrant a life sentence rather than a death sentence. Mr. Fuller was prejudiced by this deficient performance in that the life or death question was a close one, and the junk science likely tipped the scales in favor of death. ............................................ 42

Claim No. 9.................................................................................................... 45

The Texas Death Penalty Statute, Article 37.071, of the Texas Code of Criminal Procedure, in effect at the time of the offense, violated the Cruel and Unusual Punishment Clause of the Eighth Amendment, the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by failing to provide jurors with the option of life in prison without parole. ...................................................................... 45

Claim No. 10 ................................................................................................... 51

The state has not disclosed to Mr. Fuller all exculpatory and mitigating evidence in the hands of the prosecution team. Mr. Fuller has been prejudiced in that a range of important items were withheld or not disclosed that were exculpatory or mitigating in nature, and thus not produced for his trial counsel. [*Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Banks v. Dretke*, 124 S.Ct. 1256 (2004)]........................................... 51

Claim No. 11 ................................................................................................... 54

The special sentencing issue asking jurors to weigh mitigating circumstances against aggravating circumstances violates the Cruel and Unusual Punishment Clause of the Eighth Amendment and Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because it

does not provide a means for jurors to give effect to the mitigating circumstances warranting a life sentence, it shifts the burden of proof to the defendant to prove that sufficient mitigating circumstances exist to warrant a life sentence and it does not require jurors to consider mitigating circumstances alone in determining whether a life sentence is warranted. ................................................................................................................................... 55

Claim No. 12 ................................................................................................................... 58

The Texas Death Penalty Statute, Article 37.071, of the Texas Code of Criminal Procedure, violates the Cruel and Unusual Punishment Cause of the Eighth Amendment and the Due Process Clause of the 14th Amendment to the U.S. Constitution by limiting jurors to "relevant" mitigating circumstances, thereby creating an unconstitutional nexus requirement condemned by *Smith v. Texas* and *Tennard v. Dretke*. ........................................................... 58

Claim No. 13 ................................................................................................................... 66

Petitioner is actually innocent of capital murder, and his conviction and sentence violate his federal constitutional rights under the Fifth, Sixth Eighth and Fourteenth Amendments to the U.S. Constitution; to the extent his trial attorneys failed to properly investigate, develop, preserve and/or present this defense, they were ineffective, in violation of Mr. Fuller's rights under the same constitutional provisions. ........................................................................................ 66

PRAYER FOR RELIEF ............................................................................................................ 71

CERTIFICATE OF SERVICE ................................................................................................... 73

APPENDIX OF EXHIBITS ...................................................................................................... 74

COMES NOW, Barney Ronald Fuller, Jr., currently confined on death row in the Texas Department of Criminal Justice, Institutional Division, who petitions this Honorable Court, pursuant to 28 U.S.C. sec. 2254, et seq., to issue a writ of habeas corpus ordering that his sentence of death be vacated. In support whereof, Mr. Fuller would show this Court as follows:

## I.

### PROCEDURAL HISTORY

Mr. Fuller was indicted by a Houston County Grand Jury for the offense of capital murder, alleged to have occurred on May 14, 2003. Mr. Fuller was convicted after pleading guilty to a jury, he was tried *in absentia*, and sentenced to death on July 21, 2004. An automatic appeal followed, and on April 30, 2008, the Texas Court of Criminal Appeals affirmed the conviction and death sentence. *Fuller v. State*, 253 S.W.3d 220 (Tex. Crim. App. 2008). A petition for writ of certiorari was filed with the United States Supreme Court, which was denied on January 12, 2009. *Fuller v. v. Texas*, 555 U.S. 1105, 129 S.Ct. 904(2009). State post-conviction proceedings were conducted and relief was denied on January 14, 2015. The Texas Court of Criminal Appeals denied relief without a written order or opinion.

## II.

### STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a federal court may not grant habeas relief after an adjudication on the merits in a state court proceeding unless the adjudication of the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The Supreme Court has "made clear that the

'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quotations omitted). "In other words, a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Id*. However, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Under § 2254(d)(2), "a federal habeas court must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Rice v. Collins*, 546 U.S. 333, 338 (2006). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' § 2254(e)(1)." *Id*. at 338–39. Finally, where the state court did not decide the case on the merits, despite being offered an opportunity to do so, the AEDPA is inapplicable, and a de novo standard is appropriate. 28 U.S.C. § 2254(d); *Reed v. Quarterman*, 555 F.3d 364, 369-70 (5th Cir. 2009); *Rosales v. Dretke*, 444 F.3d 703, 707 (5th Cir. 2006).

## STATEMENT OF FACTS

A. Introduction

The trial record reflects that over the course of a few years, Barney Ronald Fuller, Jr.'s neighbors, the Copelands, had called law enforcement on Mr. Fuller for firing guns at their house, allegedly shooting their dog, allegedly shooting the electrical transformer to their home and finally, committing the misdemeanor offense of terroristic threat.  Upon receiving notice of the upcoming court date, Mr. Fuller grew increasingly irrational and hostile, and he began using

6

drugs and alcohol in large quantities.  Finally, while intoxicated, Mr. Fuller kicked his family out of his home, loaded an AR-15, .40 handgun and  shotgun and traveled to the Copeland home around 1:00 A.M.  Upon arrival, Mr. Fuller fired multiple rounds into the exterior and windows of the house before entering.  After entering the home, Mr. Fuller shot and killed Annette and Nathan Copeland and wounding their son, Cody.   Mr. Fuller then retreated to his home until he surrendered to law enforcement at approximately noon, 10 ½ hours after the Copelands were shot.  Mr. Fuller confessed to killing the Copelands seemingly to anyone who would listen and tried to plead guilty at his arraignment.

      B.  <u>Jury Selection and Pre-Trial</u>

      As jury selection got underway and after the lawyers interviewed the second juror, Mr. Fuller asked to be excused from jury selection.  (R.R. 9 at 58-59.)  The court postponed its decision.  (R.R. 9 at 61, 64.)  Without engaging any professional in its assessment, the court observed that Fuller spoke well and displayed no obvious signs of mental incompetency. (R.R. 9 at 61.)  Later the same day, the Defense explained that Fuller's presence was to some degree detrimental to his defense because he periodically becomes agitated.  (R.R. 9 at 149.)  The court granted Fuller's request to return to his cell.  (R.R. 151-52.)

      Fuller's attorney announced before trial that he would not present significant psychological testimony.  (R.R. vol. 20 at 30.)  On the day before evidence was set to begin, July 12, 2004, the court and the attorneys discussed whether Fuller could or should be allowed to be absent from the trial.  Fuller said he did not want to be present during trial.  (R.R. vol. 20 at 11.)  Fuller refused to give a reason. (R.R. vol. 20 at 11.)  His attorney agreed with his client's decision and called it a strategic trial decision.  (R.R. vol. 20 at 9.)  The State objected to his absence from trial and was overruled.  (R.R. vol. 20 at 12.)  There was no discussion of Fuller's

mental competency, nor was there any engagement by the court, or request by the parties, to have Mr. Fuller professionally assessed for competency.  (R.R. vol. 20 at 9-13.)  The parties planned that after entering his plea before jurors, the court would take a break and Fuller would be returned to jail.  The trial would begin and jurors would not be told why Fuller was gone. (R.R. vol. 20 at 13.)  Defense attorney House did not want anyone to explain to jurors Fuller's absence. (R.R. vol. 20 at 13.) The State agreed.  (R.R. vol. 20 at 13-15.)  The court told Fuller that he could return to the trial any time he wished.  (R.R. vol. 20 at 16, 68, 74.)

C.  Guilty Plea

Evidence began on July 13, 2004.  When Mr. Fuller was formally arraigned before the jury, he pleaded guilty to capital murder. (R.R. vol. 20 at 59-60.)  The court excused the jury and admonished Mr. Fuller on his plea before finally accepting his guilty plea. (R.R. vol. 20 at 60-65.)   The court then found him guilty of capital murder before the jury. (R.R. vol. 20 at 68-73.) At Fuller's request and his lawyer's preference, Mr. Fuller then left the courtroom and returned to his cell.  (R.R. vol. 20 at 67-68, 73-74.)  The State objected and was overruled. *Id*.  He remained absent from the entire trial (which, given the guilty plea, was a trial about sentencing only), and did not come back to court until the jury returned its verdict and he was sentenced to death. (R.R. vol. 21 at 439-40,541,546, 608-17.)

D.  The Sentencing Hearing

Because Mr. Fuller pled guilty, the State used the ensuing sentencing trial to present the underlying facts of the crime as its primary case in aggravation of sentence.  In addition, the State relied upon the usual hired gun expert witness to claim, without any basis in science or specific fact, that Mr. Fuller was likely to be a danger in the future.

With respect to crime facts, the State presented numerous law enforcement witnesses involved in the immediate crime scene response, securing and investigation, as well as other officers who conducted interrogations of Mr. Fuller and obtained alleged statements from him, and further investigated the case.  R.R. Vol. 20 at 1 through R.R. Vol. 21 at 72).  Notably, in the cumulative testimony of all of these many witnesses, it is undisputed that Mr. Fuller cooperated fully with law enforcement, was never a disciplinary or behavior problem during his arrest or at any time while he was in jail thereafter, and had no significant prior criminal record whatsoever.

As discussed more fully in the claims below, the defense case consisted of nine witnesses total, several of whom had never met Mr. Fuller and simply provided generic testimony about addiction and about prison life in the Texas prison system.  Four family members (wife, daughter, father and sister) gave rambling testimony that largely recounted Mr. Fuller's behavioral and emotional upheavals and difficulties throughout his life.  Two jail guards confirmed that Mr. Fuller was a model inmate throughout the time he was incarcerated prior to trial at the local county jail.  The defense neither developed nor presented any mental health expert testimony or other professional or similar background information about Mr. Fuller's childhood, the underlying causes of his difficulties both then and in later life, or any other mitigating explanation for the troubles he both faced and caused throughout his life.   R.R. Vol. 21 at 71-438.

After argument, the jury answered the special issues, finding that Mr. Fuller would continue to commit future acts of violence and that there were no mitigating circumstances to warrant a life sentence.  (R.R. vol. 21 at 609).  He was then sentenced to death by the trial court. (R.R. vol. 21 at 616).

D.  New Evidence in the State Habeas Proceedings

In state habeas corpus proceedings Mr. Fuller presented substantial new information in the form of affidavits, documents, reports, and other materials, in support of several claims raised below.  Much of the new evidence concerns mitigating information that trial counsel failed to investigate, develop or present at Mr. Fuller's sentencing trial.  The new information will be summarized and discussed in the body of the relevant claims below.

## III.

## CLAIMS FOR RELIEF

**Claim No. 1.**

**Mr. Fuller was incompetent to plead guilty, to stand trial for capital murder, or to defend himself against the imposition of death as a sentence. The trial of an incompetent capital defendant offends the Due Process Clause of the Fourteenth Amendment, the right to counsel of the Sixth Amendment and the heightened reliability requirement of the Eighth Amendment.  The trial also violated Mr. Fuller's constitutional rights in failing to suspend the trial proceedings and hold a hearing on competency in the face of clear evidence of Mr. Fuller's decompensating mental state**

Mr. Fuller was incompetent to plead guilty and stand trial for capital murder.  The trial also erred in failing to hold a competency hearing in the face of mounting evidence that Mr. Fuller was in fact incompetent, both in violation of Mr. Fuller's Fifth, Sixth Eighth and Fourteenth Amendment rights under the U.S. Constitution.   In support of this claim he incorporates herein by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

The fact statement and exhibits offered in support of Mr. Fuller's claims demonstrate that he lacked the *mens rea* and the voluntariness necessary to support a conviction for capital

murder, and they also serve to demonstrate that Mr. Fuller was incompetent to plead guilty, to stand trial for capital murder, or to defend himself against the imposition of death as a sentence.

As the trial record demonstrates, Mr. Fuller did not take part in the selection of the jury. In fact, he was not even present for most of the jury selection process.  Other than to enter a plea of guilty and to receive the death verdict, Mr. Fuller was not present for his trial.

Texas law and the federal constitutional standard are the same regarding competence to stand trial.  As in *Dusky v. United States*, 362 U.S. 402 (1960), the Texas Code of Criminal Procedure provides:

 Art. 46B.003. INCOMPETENCY;  PRESUMPTIONS.  (a) A person is incompetent to stand trial if the person does not have:
(1)  sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding;  or
(2)  a rational as well as factual understanding of the proceedings against the person.
(b)  A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence.
Added by Acts 2003, 78th Leg., ch. 35, Sec. 1, eff. Jan. 1, 2004.

The evidence adduced from the trial record and in state post-conviction proceedings establishes that Mr. Fuller was incompetent to stand trial, in violation of his constitutional rights.  *Dusky*.

Moreover, when Mr. Fuller began to act irrationally at his trial, by absenting himself from the jury selection process and then through the presentation of evidence and argument, he demonstrated evidence of clear incompetence that warranted a trial court hearing.  In *Drope v. Missouri*, 420 U.S. 162 (1975), the Supreme Court held that the trial court violated Drope's due process rights when it failed to suspend his trial for a competency hearing in the face of accumulating evidence of incompetency, including an attack on his wife and a suicide attempt. The high court noted that a *nunc pro tunc*, or retrospective, determination of competence, difficult under the best of circumstances, would not be adequate in the case in as much as Drope was absent during a critical stage of his trial and thus was not observed by the court or counsel.

11

In *Pate v. Robinson*, 383 U.S. 375 (1966), the Supreme Court held that the trial court's failure to grant a competency hearing deprived Robinson of his right to a fair trial, where there was uncontradicted testimony of his history of irrational behavior, defense experts testified that he was insane and the only evidence supporting his competency was Robinson's demeanor at trial and the stipulated testimony of a state expert who did not make a determination as to Robinson's sanity. A retrospective determination of competency would be too difficult because (1) the jury would not be able to observe the subject of their inquiry, (2) the testimony of experts would have to be based solely on information in the printed record and (3) six years had passed since the trial.

The case law supports the claim Mr. Fuller makes here.  For example, in *Lafferty v. Cook*, 949 F.2d 1546 (l0th Cir. 1991), cert. denied, 112 S.Ct. 1942 (1992), the court held that the state trial court erred in finding defendant competent to stand trial.  The court held that although defendant had a factual understanding of the proceedings against him, there was evidence that he lacked a rational understanding of the proceedings because of his paranoid delusional system. The passage of six years made a retrospective hearing impractical.

The Supreme Court's decision in *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174 (2003), is also relevant to the facts presented here.  There the issue was the propriety of forced medication of the defendant.  In that context, the Court gave a hint of its view of the meaning of competence to stand trial.  The high court noted that the lower court's failure to focus upon trial competence could well have mattered. The Court in *Sells* was concerned with whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions. In the case at bar, the likely presence of one or more psychiatric conditions found by Dr. Susan Stone,

coupled with the medications Mr. Fuller was receiving while in jail, and the history she relied on in her attached affidavit, could well have the same or similar effect as the drugs in question in *Sell*. See Petitioner's appendix, Exhibit 1 and 1A.

The threshold showing required to trigger the need for a competence hearing is a low one. The Due Process Clause of the U.S. Constitution requires that the writ issue requiring a new trial, or, if such relief is denied, a retrospective competence trial to determine Mr. Fuller's competence at his 2004 trial.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*. Such review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts. *See generally* 28 U.S.C. § 2254(d)(1) & (2). In this case, the state court ruling fits within both rules. Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No. 2.**

**Mr. Fuller's trial  counsel was ineffective at the pre-trial and trial phases, in failing to investigate, discover, prepare and present substantial evidence of behalf of his client, including evidence of his client's innocence of the crime of capital murder, as well evidence that would have enabled competent mental health professional to form a reliable opinion as that Mr. Fuller was not competent to plead  guilty or stand trial for capital murder or to defend  himself against the imposition of the death  penalty.  The resulting trial violated Mr. Fuller's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S. Constitution.  These errors constitute structural defects for which  prejudice is presumed; additional, the record establishes that, but for such errors, there is a reasonable probability that the trial would have been different.**

Trial counsel were ineffective in the pre-trial and trial phases of the case, in their failures to investigate, develop, prepare and present substantial evidence that would have demonstrated their client's innocence of capital murder (see claim 3 below, incorporated herein by express

13

reference), as well as their client's incompetence to plead guilty or stand trial.  These errors were structural defects in Mr. Fuller's case and require reversal of his convictions and sentences.  In addition, the record demonstrates that, but for counsel's error, there is a reasonable probability that the outcome at either or both phases of the trial would have been different.  These errors violated Mr. Fuller's constitutional rights as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.  In support of this claim he incorporates herein by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

The Sixth Amendment guarantees a criminal defendant a right to counsel. The Supreme Court has long recognized that "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970).  An ineffective assistance claim has two well-known components: A petitioner must show (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668 at 687 (1984). To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.*, at 688. The Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510 (2003). A showing of prejudice requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, that is a trial whose result is reliable. *Strickland*, 466 U.S. at 687. Prejudice is assessed by re-weighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings. *Williams v. Taylor*, 529

U.S. 362, 397-398 (2000). Counsel also has a duty to use his skill and knowledge so as to render the trial a reliable adversarial testing process. *Strickland*, 466 U.S. at 694.

The record as it stands after state court proceedings contains the affidavits of Dr. Susan A. Stone, Linda Fuller, Bonnie Fuller, Robin Rosen Fuller, Janet Caudill-Peterson, Karen Kneezle, the investigation report of investigator Mike Dennis about Mr. Fuller's  upbringing and childhood experiences on Elm Street in Independence, Mo., the grand jury testimony of Barney Fuller Senior and Mr. Fuller's mother, Joanne K. Fuller, and Robin Fuller, the attempted interview of Joanne Fuller, and scholarly works and press accounts of scholarly works on childhood brain injuries, alcoholism, and cocaine addiction.

The cumulative impact of the information found in these affidavits makes plain that counsel had a wealth of readily available evidence, or evidence that could have been used in conjunction with one or more defense mental health experts, to demonstrate both the claim of innocence and the claim of incompetence to stand trial.

Trial counsel could have, but did not apply for funding to send investigators to La Habra, California and Independence, Mo. where Mr. Fuller spent many of his formative years.  Had Mr. Fuller's sister been more fully interviewed before the trial, and more of the details of Mr. Fuller's childbirth, religious background and upbringing been developed by trial counsel and then made available to an appropriate mental health professional, it would have become clear that Mr. Fuller's decision to plead guilty, and to absent himself from the courtroom during most of his trial were not the product of rational thought or choice.  Instead, it appears that Mr. Fuller was operating in his own delusional world supported by the perceptions of a brain damaged by head trauma at birth and shortly thereafter.  Mr. Fuller later addictions to alcohol and drugs, including crack cocaine and LSD, further damaged an already-damaged brain.

15

The scholarly works and press reports on traumatic brain injuries to children demonstrate a range of probable outcomes in later life that help explain Mr. Fuller's thinking and behavior at the time of the 2004 trial.  These scholarly works describe well recognized effects of traumatic brain injury present in Mr. Fuller's background and life behavior through the end of his trial: decreased frustration tolerance, easily angered, anxiety, overreaction to events, depression, decreased emotional responsiveness, misunderstanding what is said by others, impulsive or inappropriate social behavior, reduced judgment, fatigue or difficulty sleeping, ringing in ears. See Petitioner's Appendix, Articles 1-8.

Trial counsel failed to pick up on numerous obvious cues that Mr. Fuller was suffering from severe mental illness before, during and after the crimes, and that his decision-making powers and capacity to make good judgments were substantially impaired.  As noted above, Mr. Fuller's behavior before and leading up to the crimes for which he was charged were clear signs of mental deterioration.  A full mental health work-up, including substantial investigation into all aspects of Mr. Fuller's background and life history, was critically necessary.  The most obvious red flag was of course Mr. Fuller's abrupt choice to plead guilty and then refuse to participate in his trial.  Whatever rationality one might glean from such decisions, in this case, given the history and behavior prior to this time, trial counsel had a clear duty to seek a competency expert, a continuance, and hearing before allowing the case to go forward.  Had they done the necessary pre-trial investigation into their client's life history and mental health issues, Mr. Fuller's abrupt trial choices would have been seen in a completely different light, and one that would have led to a full-blown competency determination.  With this much at stake, trial counsel's performance was deficient in failing to conduct, well before trial, a full scale investigation into Mr. Fuller's  mental health history, including the employment of a mitigation specialist to develop a complete and

16

thorough social history, as well as one or more mental health experts to evaluate Mr. Fuller and develop and present at trial a clear picture of Mr. Fuller's mental illness.  *See and compare* Petitioner's Appendix Exhibits 6-14.

Case law supports this claim in particular.  The case of *Burt v. Uchtman*, 422 F.3d 557 (7th Cir. 2005) is similar to that of Mr. Fuller.  In *Burt*, the defendant also pleaded guilty without any concessions, was taking psychotropic medications and showed signs of severe depression. Counsel in *Burt* were found ineffective for failing to challenge their client's competence.  In *Hull v. Kyler*, 190 F.3d 88 (3rd Cir. 1999) the court held that there was prejudice because the defendant need only establish that there was a reasonable probability that he was tried while incompetent, not that he would not have been convicted.   These cases underscore the claim that, here, trial counsel failed in their duties to Mr. Fuller, and those failings resulted in a fundamentally unfair trial.

The reliability of the entire 2004 trial is called into serious question due to the failure of trial counsel, and the trial court, to develop the facts regarding Mr. Fuller's competence.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*.  Such review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts.  *See generally* 28 U.S.C. § 2254(d)(1) & (2).   In this case, the state court ruling fits within both rules. Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No. 3.**

**Petitioner Fuller was mentally incompetent and  the trial court failed to sufficiently admonish Mr. Fuller to assure that the record contained evidence that he fully understood**

**the constitutional protections he was waiving.   Therefore his guilty plea must be considered involuntary and a violation of Boykin v. Alabama, Brady v. United States and the Self-Incrimination Clause of the Fifth Amendment and the Due Process Clause of the 14th Amendment.**

Mr. Fuller was incompetent to plead guilty and stand trial for capital murder.  The trial failed to sufficiently admonish him in violation of *Boykin v. Alabama*, *Brady v. United States* and the Self-Incrimination Clause of the Fifth Amendment and the Due Process Clause of the 14th Amendment.  In support of this claim he incorporates herein by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

Mr. Fuller's guilty plea does not satisfy the requirements of *Boykin v. Alabama* and *Brady v. United States*, 397  U.S. 742 (1970), because the record does not affirmatively show that he understood the nature of the constitutional protections he was waiving when he decided to plead guilty to a capital murder which was almost certainly going to result in a death sentence. *Brady* and *Boykin* require that "the record must affirmatively disclose that a defendant who pleaded guilty entered his plea understandingly and voluntarily."  *Brady v. United States*, 397 U.S. at 747-48 n. 4.

*Brady* explored the circumstances in which one can validly waive one's Fifth Amendment right to remain silent in return for avoiding a harsher sentence.  *Brady*, 397 U.S. at 748.  The Court observed that there was a valid tactical justification for Brady's decision to plead guilty.  By doing so, in the face of possibly strong evidence against him, he avoided the death penalty. *Brady*, 397 U.S. at 749-50.  The Court, therefore, analyzed the totality of the circumstances of a defendant's plea by considering the tactical advantages of doing so. In Fuller's case, by contrast, there was <u>no</u> tactical benefit to pleading guilty.   In fact, pleading guilty  harmed  his case because  it eliminated any residual  doubt  which  jurors  sometimes harbor about the defendant's

18

guilt or sanity and use to justify a mitigating circumstance for a life sentence.  Here, Fuller  was found  guilty  by a judge  who  said  that  he  had  fully admonished  him in advance,  suggesting to jurors  that Fuller  knew  full well what  he was doing at all times,  notwithstanding his lawyers' claims that his brain and judgment were damaged by alcohol  abuse, and evidence  of paranoia  and schizophrenia, significant forms of mental illness.

Additionally, Mr. Fuller received no tactical benefit for pleading guilty.  He had no plea bargain.  He had already skipped the jury selection and, for most jurors, the only times they saw him were briefly at the collective voir dire on their initial juror summons, and then briefly when he pled guilty.  *Any and every* juror, having just heard the judge explain that Fuller understood his rights when he plead guilty, would conclude that Fuller did not care what happened to him.  That being the situation, there was no tactical benefit to warrant Fuller's lawyers acquiescence, and apparently even recommendation, that he plead guilty and skip his trial. Maybe most importantly, when Mr. Fuller pleaded guilty after being formally arraigned, the trial judge commented in front of the jury, "I anticipated this would come up" before excusing them.  R.R. vol. 20 at 60.  Yet the trial court had done nothing up to that point and subsequently d id nothing to determine Mr. Fuller's state of mind from a professional.  In the face of such circumstances, this was clearly not an ordinary plea, and it was incumbent on the trial court to spend a bit more time with Fuller and his lawyers to flesh out exactly what was going through Fuller's mind and whether he fully understood his rights.

*Boykin* requires a record which shows compellingly that the defendant was fully informed and plead guilty voluntarily and intelligently.  *Brady v. United States* seems to add the requirement that the record must also show some tactical justification for the defendant's decision

to plead guilty and surrender a mountain of constitutional rights.    The languid explanations of Fuller's attorneys are insufficient.

In federal pleas, the Supreme Court has required that the appellant show that the lack of proper admonishments affected his plea by showing that he would have taken some other course of action if properly informed.    *See* United States v. Benitez, 542 U.S. 74 (2004).  *Benitez*, however, involved a complete appellate record. In footnote ten of the decision, *Benitez* explained that *Boykin* is not subject to a harmless error analysis and still requires a complete record to show that the defendant was fully informed, otherwise it must be reversed, even if the record contains some evidence that the defendant would have still plead guilty:

This is another point of contrast with the constitutional question whether a defendant's    guilty plea was knowing and voluntary.  We have held, for example, that when the    record  of   a criminal  conviction  obtained  by guilty plea contains  no evidence that a  defendant   knew   of the rights  he was  putatively  waiving, the conviction  must  be    reversed.  *Boykin v. Alabama*, 395 U.S. 238, 243 (1969).  We do not suggest that such a    conviction  could  be  saved even by overwhelming evidence that the defendant would    have pleaded guilty regardless.

*Benitez*, 542 U.S. at 84 n.l0.

Therefore, unless the Court concludes that the admonishments and entire record meet the due process and Fifth Amendment requirements of *Boykin* and *Brady*, the Court must vacate the conviction and remand for a new trial.


**Claim No. 4**

**The admission of the confession from Mr. Fuller taken the morning of his arrest while he was still intoxicated and represented by an attorney who had instructed the sheriff not to interview Mr. Fuller violated  his  right to remain silent and right to counsel  under the Fifth, Sixth and Fourteenth  Amendments  to the U.S. Constitution.**

The admission of the confession taken from Mr. Fuller after his lawyer instructed the sheriff not to interview Mr. Fuller was in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the Constitution.  In support of this claim he incorporates herein by

express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

Mr. Fuller challenges the admission of his videotaped statement to police taken at the jail after his arrest, in violation of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  He contends that he was represented by counsel and was not told that his attorney had invoked his right to remain silent and was on his way.  "The voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation. *"United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005); *United States v. Reynolds*, 367F.3d 294, 298 (5th Cir. 2004).  These issues require the Court initially to consider the relationship of a Houston attorney to Fuller during the first few days of the case.

The murders were committed late on the night of May 13, 2003.  Fuller was arrested by law enforcement at his home around 10 a.m. the next morning, May 14, 2003.  Fuller was interviewed by law enforcement that morning and provided a videotaped statement on the way to jail and another more comprehensive statement  at the jail at around  11 :30 a.m.

As mentioned, Fuller's brother-in-law is Steven "Rocket" Rosen, a criminal defense attorney in Houston.  (R.R. vol. 8 at 5, 16.)  Mr. Rosen represented Fuller in a previous criminal trial some years earlier, winning acquittal.   (R.R. vol. 8 at 16.)  During the early morning hours after the murders, Fuller spoke several times with his father by phone.  The two discussed the need to call Mr. Rosen and get him to Crockett to see Fuller immediately.   Fuller's father evidently called Mr. Rosen pre-dawn, or shortly afterward.  At approximately 10:36 a.m. on the morning of May 14, as Fuller was being arrested, Mr. Rosen faxed a letter to the Houston Sheriff notifying him that Mr.  Rosen represented Fuller and instructing officials not to interview Fuller without his presence. (R.R. vol. 8 at 4, 10; Def. Ex. 1, 2, 3.)  At roughly 11:25 a.m., after

receiving the fax, officials in Crockett interviewed Fuller at the Sheriff's Department and obtained a videotaped statement. Fuller was said to have waived his rights to remain silent and to consult with an attorney or have one present during the interview. (R.R. vol. 8 at 11.)   Fuller, however, was not informed that Mr. Rosen had sent a fax with instructions that Fuller not be interviewed, or told that Mr. Rosen was on the way.  (R.R. vol. 8 at 15.) Fuller said that he was drunk the morning of May 14 when he was interviewed.  (R.R. vol. 8 at 15.)  Fuller was asked whether Mr. Rosen was his attorney at the time and he responded, "He was at the time, yes, yes, he was."  (R.R. vol. 8 at 15.)  Fuller said that during the night, as he awaited arrest, he spoke with his father and told him that he would need Mr. Rosen to be his attorney.  (R.R. vol. 8 at 19.)

On August 8, Fuller applied for a court appointed lawyer.  (C.R. 1 at 3.)  On August15, Mr. Rosen faxed the court indicating that he could not represent Fuller because of the emotional pressure that presenting a relative charged with capital murder would impose on his family. (C.R.  1 at 6.) Mr. Rosen explained, however, that previously he had provided legal assistance to Fuller in the form of meeting with him the morning of his arrest and talking with the District Attorney.  He indicated that he had been instructed by the court to file a motion to withdraw, although he had never entered an appearance on the indictment. (C.R. 1 at 6.)

When he was arraigned on September 12, 2003, Fuller said that Mr. Rosen did not represent him any longer.  (R.R. 2 at 3-4.)  The court made the statement, "I think he [Rosen] had communicated with the sheriff's department and/or the District Attorney's office previously in the case.  I understand he's not representing you at this time?" (R.R. vol. 2 at 3-4.) From  the context of the discussions on the record, it appears that there were  informal discussions between the participants to the effect  that whatever  Mr. Rosen's involvement previously, he would not appear for arraignment  and the court needed to appoint attorneys, who were present.

Nine months later, the court conducted a suppression hearing to address whether Fuller's videotaped statement to police the morning of his arrest was admissible. (R.R. vol.8.)  The court reviewed the videotape of Fuller which shows him answering questions and explaining what had occurred. (R.R.vol. 8 at 43; St. Ex. A.) The court denied the motion to suppress Fuller's statements. (R.R. vol. 8 at 50.) The Court did not issue findings of fact or conclusions of law, nor did Fuller's attorneys request them.

At the hearing, Fuller explained that he did not speak to Mr. Rosen the morning he was arrested. (R.R. vol. 8 at 16.)   There were no direct discussions between the two about representation; it was assumed.  (R.R. vol. 8 at 16-17.)  A sheriff deputy who assisted with the transport of Fuller said that he saw no signs that morning that Fuller was drunk or incapable of thinking clearly.   (R.R. vol. 8 at 28-30.)   The Ranger who obtained the video statement of Fuller said that he saw no signs that Fuller was intoxicated or unable to think clearly about his rights. (R.R. vol. 8 at 40, 43-44.)  He learned about Mr. Rosen's fax when he completed the interview. (R.R. vol. 8 at 35-36.)  He never spoke to Mr. Rosen.  (R.R. vol. 8 at 47-48.)   No one conducted an alcohol breath test or blood alcohol test on Fuller.

Later, sometime around mid-day or early afternoon, after police completed the videotape, Mr. Rosen arrived.  Evidently, Mr. Rosen and his wife drove from Houston to the jail in Crockett that morning after sending the fax. Mr. Rosen, either alone, or with Fuller's sister (Rosen's wife) and Fuller's father, met with Fuller to discuss what had occurred.

Mr. Fuller, Sr. (Barney's father), testified later at trial that he saw Barney (known  to family as "Rory")  at the jail the morning of his arrest, along with Mr. Rosen and Barney's brother-in-law.   Over objection, jurors were told what Barney and the attorney said to one another.  Barney blamed Mr. Rosen for not having resolved the Copeland's criminal charge. Mr.

Rosen explained to Barney that Barney misunderstood the trial setting notice he had received from the court.  (R.R. vol. 21 at 362-64.)

At the suppression hearing, nine months after the September 12, 2003 arraignment, the court expressed irritation that Mr. Rosen refused to appear to explain the scope of his representation and what actions he intended to take.  (R.R. vol. 8 at 5, 7-9.)  Although the court did not issue findings of fact , the court-was clearly convinced that even taking everything said at the hearing as true, that Mr. Rosen was representing Fuller, that Fuller had asked his father to contact Mr. Rosen to represent him, and that Mr. Rosen had instructed police not to interview Fuller, it was nonetheless Fuller's right to waive his right to counsel and confess to police. (R.R. vol. 8 at 49-50.)   Further, the court concluded that Fuller was not drunk, or at least not so intoxicated as to misunderstand his rights. (R.R.vol.  8 at50.) The court later commented during trial that it did not believe that Mr. Rosen was ever established as attorney for Fuller.  (R.R.vol. 21  at  361-62.) At trial, Fuller's videotaped statement was shown to jurors over objection.   (R.R. vol. 20 at 516; St. Exh. 238.

Mr.Rosen was clearly Fuller's lawyer.   Rosen considered himself Fuller's lawyer and rushed to Crockett when called. He had represented Fuller earlier on an earlier  criminal   charge and was representing him on his pending one involving  the Copelands. Moreover, Fuller considered Mr. Rosen his lawyer. Before his arrest he told his father to call Mr. Rosen to come help him immediately.

The question is whether Fuller waived his lawyer's participation in interrogation. Fuller contends that he did not intend to do so because he did not realize that Mr. Rosen had already provided legal instructions to the Sheriff's Department not to interview him. Fuller did not realize that Mr. Rosen was on his way to see him.  These two critical facts were withheld from

him by the Sheriff's Department and thereby rendered any relinquishment of his self-incrimination rights involuntary.

*Moran v. Burbine*, 475 U.S. 412 (1986), is the leading decision by the Supreme Court on waivers of counsel by accused citizens who do so unaware that a lawyer has invoked · silence on their behalf. *Burbine* holds that it is immaterial whether an attorney has attempted to intervene on behalf of an accused if the accused is unaware of it. The police are under no duty to cease interrogation because of a lawyer's entreaties to inform the accused.

A statement is "involuntary" if "a defendant's will was overborne" considering "the totality of all the surrounding circumstances -both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167(1986). "While the defendant's mental condition is an important consideration, to find a statement involuntary, the police must somehow overreach by exploiting a weakness or condition known to exist." *United States v. Guerra*. 983 F.2d 1001, 1002 (10th Cir. 1993).

Fuller contends that his statements were involuntary.  First, he was not informed that his lawyer was on his way and had instructed deputies not to interview Fuller.  Second, Fuller was intoxicated.  The officers' claims that Fuller acted and talked normally are not credible. Fuller was an alcoholic accustomed to drinking large amounts.   He could be completely intoxicated without showing the effects externally.  His judgment, however, was completely affected.   The officers could and should have conducted a breath alcohol test and easily confirmed or dispelled his intoxication.  For these reasons, the good faith exception to the Fifth Amendment of United *States v. Leon*. 468 U.S. 897 (1984), does not apply.

Supporting cases include: *Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005) (finding that defendant had invoked right to counsel when interrogated and confession was involuntary); *See* g*enerally Jackson v. Frank*, 348 F.3d 658 (7th Cir. 2003) (denying relief but questioning confession). The following cases support the State and found sufficient circumstances to conclude that the defendant voluntarily waived his right to silence:  *Michigan v. Mosley*, 423 U.S. 96 (1975); *United States v. Rodriguez-Preciado*, 399 F.3d 1118 (9th Cir. 2005); *Evans v. McCotter*, 790 F.2d 1232, 1238 (5thCir. 1986); *United States v. Ogden*. 572 F.2d 501 (5thCir. 1978).

Mr. Fuller contends that his attorney client relationship and representation by Mr. Rosen attached the morning before his arrest when his father called Mr. Rosen and explained  that Fuller was about to be arrested  for murder.  At the least, the representation began before Fuller's interview when Mr.  Rosen faxed the Sheriff's Department. The interview was a proceeding in which Fuller was entitled to an attorney.  *See Moran v. Burbine*, 475 U.S. at 428-29; *United States v. Gouveia*. 467 U.S. 180,187 (1984);  *Kirby v. Illinois*,  406  U.S. 682,  689 (1972) (opinion   of Stewart,   J.).  Fuller acknowledges that his Sixth Amendment right may be foreclosed by *Burbine*, but contends that the differences are: (1) that Fuller had told his father to get Mr. Rosen involved, (2) on the specific case for which Fuller was interrogated, (3) Mr. Rosen sent written instruction that he would represent Fuller, (4) on the specific case for which Fuller was interrogated, (5) and not to question Fuller without his presence. These circumstances are sufficient to invoke the Sixth Amendment for interrogation, notwithstanding that the interrogation has been deemed by *Burbine* not to constitute a critical proceeding.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*.  Such

26

review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts.  *See generally* 28 U.S.C. § 2254(d)(1) & (2).   In this case, the state court ruling fits within both rules. Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No.5.**

**The performance of Petitioner's trial counsel was deficient in that they waived the presumption of innocence and the requirement that all the elements of guilt, [including a voluntary act and  mens rea], be proved beyond a reasonable doubt by advising Petitioner to enter a plea of guilty. Petitioner, a chronic alcoholic and cocaine addict was prejudiced by the waiver because there was evidence readily available that Petitioner was unconscious of true reality and entertaining a delusion he thought was real at the time of the killings.**

Trial counsel provided ineffective assistance in advising Mr. Fuller to plead guilty despite a viable defense to the crime of capital murder, in violation of Mr. Fuller's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.  There is a reasonable probability that the outcome would have been different, and that Mr. Fuller would not have pled guilty, but for trial counsel's ineffective representation.   These errors violated Mr. Fuller's constitutional rights as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.   In support of this claim he incorporates herein by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

The Sixth Amendment guarantees a criminal defendant a right to counsel.  The Supreme Court has long recognized that "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970).  An ineffective assistance claim has two well-known components: A petitioner must show (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466

U.S. 668 at 687 (1984). To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id*., at 688. The Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510 (2003).  A showing of prejudice requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, that is a trial whose result is reliable. *Strickland*, 466 U.S. at 687. Prejudice is assessed by re-weighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings. *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000). Counsel also has a duty to use his skill and knowledge so as  to render the trial a reliable adversarial testing process. *Strickland*, 466 U.S. at 694.

The right to effective assistance of counsel extends to the plea bargaining phase of trial. A criminal defendant has a right to effective representation throughout the process whereby they choose whether to plead guilty to a crime.  *Padilla v. Kentucky*, 559 U.S. 356 (2010);  *Lafler v. Cooper,* 132 S.Ct. 1376 (2012); *Missouri v. Frye*, 132 S.Ct. 1399 (2012)

Counsel's representation here caused Mr. Fuller to forfeit his rights by advising him to plead guilty.  Trial counsel either did not know about the traumatic brain injuries at birth and as an infant because they did not ask about it, or they simply were not aware of the long term consequences and effects of such injuries.  Trial counsel were seemingly unaware that Texas law provided for a defense based on lack of consciousness, semi-consciousness, and insane delusions flowing from involuntary intoxication and other mental health defects or diseases. See Petitioner's  Articles1-18.  As a result, their advice to Mr. Fuller to plead guilty was ineffective and erroneous.

Prejudice is shown in that the failure to discover and present Mr. Fuller's mental health history from birth until the time of the killings and the concomitant plea of guilty to a crime bearing death as a penalty option, left Mr. Fuller completely in the dark about his available trial options, undermining confidence in the validity of the plea that he entered. There is a reasonable probability that, but for the failure of trial counsel to discover and present the mental health evidence, and to obtain a jury instruction pertaining to it, the outcome of the trial would have been different and Mr. Fuller would not have pleaded guilty to capital murder.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*. Such review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts. *See generally* 28 U.S.C. § 2254(d)(1) & (2). In this case, the state court ruling fits within both rules. Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No.6.**

**Trial counsel provided ineffective representation at the sentencing phase of the trial in failing to investigate, develop and then present to the sentencing jury important mitigating information and evidence regarding the circumstances of Petitioner's background and upbringing that would likely have caused at least one juror to vote for a life sentence rather than a death sentence.**

Trial counsel provided ineffective assistance in preparation for and in their representation at the sentencing phase of trial, in violation of Mr. Fuller's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. There is a reasonable probability that the outcome would have been different, and that Mr. Fuller would not have been sentenced to death, but for trial counsel's ineffective representation. In support of this claim he incorporates herein

by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

The Sixth Amendment guarantees a criminal defendant a right to counsel.  The Supreme Court has long recognized that "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970).  An ineffective assistance claim has two well-known components: A petitioner must show (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668 at 687 (1984). To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id*., at 688. The Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510 (2003).  A showing of prejudice requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, that is a trial whose result is reliable. *Strickland*, 466 U.S. at 687. Prejudice is assessed by re-weighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings. *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000). Counsel also has a duty to use his skill and knowledge so as to render the trial a reliable adversarial testing process. *Strickland*, 466 U.S. at 694.

It is important to note, however, that on the issue of prejudice, a reasonable probability is measured by whether the error is sufficient to undermine confidence in the outcome, that is, whether the outcome cannot be relied upon to have been a just result.  *Strickland*, 466 U.S. at 694.   The court must evaluate the evidence presented originally at trial, together with the totality

of the omitted evidence in the post-conviction record, to determine whether the entire record, viewed as a whole, raises "'a reasonable probability that the result of the ... proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." *Williams*, 529 U.S. at 399 (emphasis added). *See also*, *Wiggins***,** 539 U.S. at 523.   In context of a capital sentencing proceeding under the Texas death penalty scheme, a reasonable probability is measured merely by whether there is a reasonable chance that only one juror might have been influenced by the evidence presented.  *See*, *Wiggins*, 539 U.S. at 537. *See also*, Tex.Code Crim.Pro. Art. 37.071, Sec. 2(b)(2), (f)(2), and (g) (requiring jury unanimity in finding future dangerousness, and unanimity in returning a negative answer to the mitigation special issue).

The cornerstone of trial counsel's obligation with respect to the punishment phase of a capital trial is the duty to conduct an extensive and thorough investigation into the defendant's entire background. *Wiggins*, 539 U.S. at 522; *Williams v. Taylor*, 529 U.S. 362, 396 (2000).  A failure to uncover and present mitigating evidence cannot be justified as a tactical decision when defense counsel has "not 'fulfill[ed] [his] obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*,  539 U.S. at 517 (*quoting Williams*, 529 U.S. at 396).

In the present case there is a significant difference between what trial counsel investigated, developed, and presented on behalf of Mr. Fuller at sentencing, and what was readily available had trial counsel employed the necessary investigative and expert assistance prior to trial, then investigated and developed and presented the wealth of available mitigating evidence during the sentencing proceeding.  That failure is the basis for the claim of deficient counsel performance.  As for the prejudice prong, Petitioner has substantially enlarged the body of evidence available to the jury at his trial.. To demonstrate both prongs, it is useful to

summarize the mitigation case offered by his counsel at trial, then describe the  evidence he neither developed nor presented that was readily available and could have been developed and presented at trial counsel if the proper work had been conducted.

### THE SPARSE MITIGATION CASE PRESENTED AT TRIAL

The defense mitigation case at the sentencing proceeding was brief.  Nine witnesses were presented in cursory fashion.  (R.R. vol. 21. at 3)  The defense witnesses' testimony consumed only pages 73 to 130 and pages 162 to 441 of volume 21, only 336 pages of double-spaced text. Three of the witnesses had never met Mr. Fuller, and two more only knew him while they were guarding him at the local county jail after his arrest.  Three themes were touched on, without any serious underlying investigative or mitigating effort: addiction, incarceration, and erratic emotional swings and behavioral patterns.  The result was a slapdash presentation that likely scared the jury more than it mitigated the defendant.

With regard to the issue of Mr. Fuller's long-term addiction to drugs and alcohol, the defense only called one "expert" witness, Alan Hopewell, who said nothing about Mr. Fuller specifically but merely provided the jury background information on substance and its causes and effects.   The impact of his testimony was completely undermined, therefore, by the prosecutor on cross-examination, during which he had to admit that he reviewed ***nothing*** about the case, had not interviewed Mr. Fuller nor any of the case witnesses, and could not speak specifically about Mr. Fuller or his condition in any way, especially regarding any background information that might have explained the genesis and etiology of his long-term addictions. (R.R. vol. 21. at. 73-130.)

With regard to the question of incarceration, defense counsel presented two local jailer witnesses who very briefly acknowledged that Mr. Fuller had not exhibited any problems while

housed in the jail prior to trial, and two prison officials who, without any specific information regarding Mr. Fuller, merely testified about the conditions of a life sentence in the Texas prison system.  (R.R. vol. 21, at 182-242)

The remaining four witnesses presented by the defense were family members.  (Mr. Fuller's wife, daughter, father and sister).  (R.R. vol. 21 at 270-430)  Most of the testimony provided by these witnesses concerned evidence of troubled behavior, whether as a child growing up, or as an alcoholic father and husband in adult life.  There was no explanation, either expert or otherwise, about the causes of such behavior, either due to addiction issues or the underlying mental health roots of such, and so this testimony painted an admittedly unflattering picture.

What emerges with clarity from the meager trial record presented by defense counsel is that Mr. Fuller, from a young age, had persistent behavioral and emotional problems, he early on became addicted to alcohol and drugs, and that although he had some manual labor skills and talents which he would and could at times put to good use in gainful employment and as a family provider, he never maintained his clearly honorable intent without marked interruptions characterized by bizarre, paranoid, impulsive and irrational acts.  And although the law does not require it, it is also clear that these significant irrational upheavals were obviously in play in the events that led to the tragedy for which Mr. Fuller was sentenced to death.  The trial record is replete with testimony about how Mr. Fuller's irrational actions, statements, etc., were driving him to a madness that ended in tragedy.  But once again, through counsel's failure to provide it, no understanding about the causes of these behavioral patterns was provided to the jury.

What one is left with after reviewing the entire defense case at sentencing, then, is a glaring question mark as to how and why Mr. Fuller underwent such painful (and at times destructive) swings of emotion and behavior throughout his life, swings which he could never

33

fully control or prevent, and which (though never triggering any serious criminal behavior in the past) played such a clear and significant role in the crimes at issue.  The answer, of course, could have been discovered and presented, and had trial counsel done so, the jury would not have sentenced him to die.   Absent such critical explanatory evidence, however, trial counsel's presentation was destined to lead to the very sentence the jury pronounced.

**THE ENLARGED MITIGATION CASE PRESENTED HERE**

**Summary of evidence presented post-trial**

Available evidence that was neither developed nor presented by trial counsel paints a vastly more complete and more mitigating picture of the man the jury sentenced to death in this case.  Rather than simply presenting the outer behaviors displaying addictive, erratic, raging, and sometimes violent tendencies, the available information would have given the jury a fuller picture of how those tendencies came to be, why, and, though not excusing the crimes, would have provided a basis for a grant of mercy in this case.   Importantly, that picture dates to childhood facts and factors over which young Barney Fuller was powerless to either control or withstand.

First and foremost is a history of severe childhood trauma largely stemming from abusive parenting.  Had trial counsel done the proper investigation, they would have discovered the very sort of mitigating evidence which the U.S. Supreme Court has identified repeatedly in overturning death sentences in cases where trial counsel failed to discover and present such evidence to the jury.  *See Wiggins*, *Rompilla*, etc.  Neighbor witnesses could have attested to the abuse they observed inflicted upon young Barney throughout his childhood, including beating, name-calling, and other forms of mistreatment. For example, Curt Fraund knew Mr. Fuller when they were around 7 years of age while growing up in La Habra, California.  He recalls Mr. Fuller

being whipped constantly with a belt or switch for minor infractions.  He recalled the welts on Mr. Fuller's legs and that his father was "over top" on punishing Mr. Fuller.  He also recalled that Mr., Fuller's mother would yell and scream at him a lot and that she was not stable. See Petitioner's Exh.  12.  Janet Peterson-Caudill, also a childhood acquaintance from La Habra, describes similar behavior directed at Mr. Fuller.  She lived next door to the Fuller's  and heard Mr. Fuller's father yelling at him a couple of times a week and was aware that Mr. Fuller was frequently beaten by his father. See Petitioner's Exh. 13.   Likewise, Karen Kneezle, knew the hardship Mr. Fuller faced as a child in La Habra.  She was friends with Mr. Fuller's neighbor, Janet Peterson-Caudill, and she recalls the same type behaviors directed at Mr. Fuller. Additionally, at the time of her affidavit, she had been a school teacher for 14 years and, in retrospect believes Mr. Fuller suffered from ADHD which exacerbated the problems with his father, whom she described as mean.  See Petitioner's Exh. 11.

Part and parcel of the abusive home environment was a childhood marked by chaos, fear, and an extremely controlling and restrictive household.  Mr. Fuller's family moved frequently throughout his childhood.  Young Barney began to develop problems in school, and so his father removed him from the local school he was attending and put him in a school he himself taught. Violence and chaos at home led to running away and eventually a foster family for young Barney.  See Petitioner's Exh. 4, Grand Jury Testimony of Barney Fuller Sr..

The school issues Barney was experiencing were likely the result of an underlying and early onset of undiagnosed bipolar disorder.  The family, and particularly the father, viewed the behavior and school problems only as a character defect, not a health or mental health issue.  The father in fact called his son "Satan", and told him to pray.  See Petitioner Exh. 4, 6..

Neglect was also a theme in Mr. Fuller's childhood.  He was never taken to a doctor as a child (apparently due to his father's extreme religious views); the only time in his entire life that he went to the dentist was to have teeth pulled, never for cleaning or checkups.  (It is unclear whether the father had religious problems with dentistry, as he did with other forms of medicine, or if this was simply a matter of abject neglect) See Petitioner's Exh. 8.

Second, and equally important, Mr. Fuller suffered from severe brain damage, likely as a result of head trauma inflicted both during birth and through injuries due to parental neglect.  See Petitioner's Exh. 1, 8.  Once again, the jury heard nothing about this severe medical condition, and yet it is precisely the sort of evidence the U.S. Supreme Court has relied upon in finding counsel ineffective for failing to develop and present in capital sentencing proceedings.  *Id*. *Wiggins, Rompilla, etc.*

Third, reliable expert testimony could have been developed, but trial counsel did not, indicating that in addition to brain damage, Mr. Fuller likely suffers from several other serious mental illnesses.  For instance, Dr. Stone hypothesized that Mr. Fuller suffered from ADHD, schizoaffective disorder and poly-substance abuse and dependence. Petitioner's Exh. 1. Affidavit of Dr. Susan Stone.

Fourth, the bizarre religious ideations and beliefs Mr. Fuller exhibited and propounded, left unexplained, would have been troubling, to be sure, to any juror; however, evidence developed post-trial puts this information in a context that once again mitigates in favor of mercy for Mr. Fuller.  Mr. Fuller's own views were the manifestations of an extreme and severely controlled childhood dominated by the extreme religiosity of his father.   That evidence demonstrates that Barney Fuller, Sr. was a religious zealot with extreme views which he forced on his family in a highly restrictive and controlling environment, often becoming violent when

36

his views were ignored or violated.  The evidence developed post-trial shows that Barney's father ("Senior") was an autocratic, narcissistic figure.  He thought and talked much about himself.  He did not believe in medical science.  Senior's family rarely saw a doctor.  He felt that prayer and prayer alone was the answer for human problems, including health and mental health problems.  During young Barney's early childhood, only religious programs could be played on the radio in his house, and Senior would become angry if the radio channel was changed.  See Petitioner's Exh. 4, 8, 13.

**Prejudice**

There is a reasonable probability that, had trial counsel done an adequate pre-trial investigation with the appropriate investigative and expert assistance, Mr. Fuller would not have been sentenced to death.  The kind of evidence developed in post-conviction here is a well-established form of deficient performance that has often been found to result in prejudice to the client.  *See Collier v. Turpin*, 177 F.3d  1184, 1281- 1282 (11th Cir. 1999).

In *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527 (2003), the Supreme Court held trial counsel ineffective in a capital case, decided under the AEDPA, for failing to adequately investigate, prepare and present mitigation.  Trial counsel's failings in that case largely track with the failings found here.  In *Wiggins* trial counsel relied on arguments that the defendant was not directly responsible for the murder and did not present any social history or other mitigation, despite knowledge of at least some of the defendant's background information.  The issue before the Court was "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable." *Id*. at 2536 "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent

37

consideration of the challenged conduct as seen 'from counsel's perspective at the time.'"  *Id*. (quoting *Strickland*, 466 U.S. at 688).  In that case, where counsel had only limited records available and did not investigate further, counsel's conduct "fell short of the professional standards that prevailed in Maryland in 1989," because no "social history report" was prepared even though counsel had funds available to retain a "forensic social worker." *Id*. at 2536.

The Court in *Wiggins*  relied upon the standards for capital defense work set forth in the American Bar Association (ABA) guidelines to which the Court referred as "guides to determining what is reasonable."  *Strickland*, supra, at 688; *Williams v. Taylor*, supra, at 396.  The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) *Id*.  The Court found in *Wiggins* that "[d]espite these well-defined norms, ... , counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id*. at 2537 (citing the ABA standards again).  The Court found that "[t]he scope of their investigation was also unreasonable in light of what counsel actually discovered" in the records available to them, "particularly given the apparent absence of any aggravating factors in petitioner's background." *Id*. at 2537 (citation omitted).

The Court in *Wiggins* paid careful attention to trial counsel's pre-trial investigations in the case, making clear that a failure to investigate could not be justified simply by a lack of available information at the outset.   "In assessing the reasonableness of an attorney's investigation, ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate

further.  Even assuming [counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy.  Rather, a reviewing court must consider the reasonableness of the investigation said to support the strategy." *Id*. at 2538.  The Court in *Wiggins*  found that "counsel were not in a position to make a reasonable strategic choice ... because the investigation supporting their choice was unreasonable." *Id*. at 2543. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigation evidence." *Id*. at 2542. "[W]e evaluate the totality of the evidence - 'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'" *Id*. at 2542 (quoting *Williams v. Taylor*, 529 U.S. at 397-98).

With regard to the prejudice prong of the ineffectiveness standard, the Court in *Wiggins* found it there because counsel did not discover "powerful" evidence of abuse, as well as neglectful parenting, foster homes, chaos in the childhood, and "diminished mental capacities." *Id*. at 2542. "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a difference balance." *Id*. at 2543.

*Wiggins* and the other relevant Supreme Court precedents apply with convincing force in this case.  Moreover, just as in that case, the state court decision here denying relief was "objectively unreasonable," *id*. at 2538, and an unreasonable application of *Strickland* (under the AEDPA standards) because the state court did not conduct an assessment of whether the decision to cease all investigation ... actually demonstrated reasonable professional judgment.  The state court merely assumed that the investigation was adequate.  In light of what the ... [available] records actually revealed, however, counsel chose to abandon their investigation at an

39

unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id*.

Applying the Supreme Court's decisional law here, it is clear that Petitioner received ineffective assistance of counsel during the punishment phase of trial as a result of counsel's inadequate investigation into Mr. Fuller's background, character, and circumstances of the offense. In addition to, or in the alternative, trial counsel rendered ineffective assistance of counsel at the punishment phase of trial through deficiently executing the defense mitigation strategy through failing to use readily available evidence and testimony which would have presented a more detailed, first-hand, and compelling depiction of Mr. Fuller's character, background, and circumstances.

The prosecutors took full advantage of the failings of trial counsel in their insufficient investigation and presentation at the sentencing trial. Thus, due to the aforementioned, generic, and otherwise unsubstantiated testimony of the defense witnesses, and the lack of any expert mental health evaluation or testimony the prosecutor systematically denied the existence of any alcohol, alcoholism, drug addiction, mental illness or child abuse in Mr. Fuller's background. *See* Vol. 21, P. 585, et. seq.

Here, however, if trial counsel had conducted a thorough investigation into Mr. Fuller's background, coupled with the competent use of the appropriate mental health experts, they could have instead credibly depicted Mr. Fuller a severely damaged individual, who, as a result of abuse, neglect and mental illness, turned to the use of alcohol and drugs as "self-medication", to the point of addiction, and as a combined result of his addiction and mental illness, sank into an increasingly downward spiral, culminating with the crimes for which he was sentenced to death here.

40

Instead, as a result of defense counsel's limited investigation, the failure to present critical witnesses and evidence regarding Mr. Fuller's childhood, background and life story, and the failure to competently make use of available medical-psychological evidence, counsel's execution of the mitigation strategy did nothing to present Mr. Fuller as a human being, subject to weaknesses and failings, many beyond his volition.  Had the jury been presented with the available testimony in a competent manner, there is a reasonable probability that at least one juror would have felt compelled to return a different verdict during the punishment phase of trial. *Wiggins*, 539 U.S.  at 537.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*.  Such review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts.  *See generally* 28 U.S.C. § 2254(d)(1) & (2).  In this case, the state court ruling fits within both rules. Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No. 7.**

**Death may not be imposed on Mr. Fuller because his sentencing hearing was rendered fundamentally unfair and unreliable because of the junk science used to establish that he would be a continuing threat to society and lacked sufficient mitigating circumstances  to warrant a life sentence rather than a death sentence. [Due Process Clause of the Fourteenth Amendment, Eighth Amendment reliability]**

The record evidence of Mr. Fuller's life history fails to show a dangerous career criminal deserving of death.  The State's most powerful arguments for death were not Mr. Fuller's background, but the nature of the crime itself.  The record evidence from Linda Fuller, Bonnie Fuller, Robin Fuller and Alan Hopewell suggests that the crime is better understood as a

41

psychotic episode that took place under an insane delusion that the victims were agents of the devil, etc.

The prosecutors took great advantage of the junk science the judge erroneously admitted. It tended to refute the Hopewell, Perryman-Evans, and Fitzgerald testimony that suggested that behavior like Mr. Fuller's on the occasion in question would likely be controlled during that 40 year period of parole ineligibility.

In sum, absent the junk science, the evidence in the trial record  is not overwhelmingly in favor of the State on the issues of future dangerousness and mitigation.  The junk science tipped the scales in favor of death.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*.  Such review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts.  *See generally* 28 U.S.C. § 2254(d)(1) & (2).   In this case, the state court ruling fits within both rules. Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No. 8.**

**The performance of Mr. Fuller's  trial counsel was deficient in any perceived failures to raise or adequately preserve complaints about the admission of junk science evidence used to establish that he would be a continuing threat  to society and lacked sufficient mitigating circumstances  to warrant a life sentence rather  than a death sentence. Mr. Fuller was prejudiced by this deficient performance in that the life or death question was a close one, and the junk science likely tipped the scales in favor of death.**

To the extent that there exists any perceived failure on the part of trial counsel to adequately raise or preserve the issue of junk science as it pertains to the state's presentation of

evidence on the special issue of future dangerousness, trial counsel provided ineffective assistance in preparation for and in their representation in this respect of the trial, in violation of Mr. Fuller's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. There is a reasonable probability that the outcome would have been different, and that Mr. Fuller would not have been sentenced to death, but for trial counsel's ineffective representation.   In support of this claim he incorporates herein by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

The Sixth Amendment guarantees a criminal defendant a right to counsel.  The Supreme Court has long recognized that "the right to counsel is the right to the effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970).  An ineffective assistance claim has two well-known components: A petitioner must show (1) that counsel's performance was deficient, and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668 at 687 (1984). To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id*., at 688. The Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510 (2003).  A showing of prejudice requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, that is a trial whose result is reliable. *Strickland*, 466 U.S. at 687. Prejudice is assessed by re-weighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings. *Williams v. Taylor*, 529

U.S. 362, 397-398 (2000). Counsel also has a duty to use his skill and knowledge so as to render the trial a reliable adversarial testing process. *Strickland*, 466 U.S. at 694.

It is important to note, however, that on the issue of prejudice, a reasonable probability is measured by whether the error is sufficient to undermine confidence in the outcome, that is, whether the outcome cannot be relied upon to have been a just result. *Strickland*, 466 U.S. at 694. The court must evaluate the evidence presented originally at trial, together with the totality of the omitted evidence in the post-conviction record, to determine whether the entire record, viewed as a whole, raises "'a reasonable probability that the result of the ... proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence." *Williams*, 529 U.S. at 399 (emphasis added). See also, *Wiggins*, 539 U.S. at 523. In context of a capital sentencing proceeding under the Texas death penalty scheme, a reasonable probability is measured merely by whether there is a reasonable chance that only one juror might have been influenced by the evidence presented. *See*, *Wiggins*, 539 U.S. at 537. See also, Tex.Code Crim.Pro. Art. 37.071, Sec. 2(b)(2), (f)(2), and (g) (requiring jury unanimity in finding future dangerousness, and unanimity in returning a negative answer to the mitigation special issue).

There could not be any tactical or strategic advantage to Mr. Fuller for his trial lawyers to unsuccessfully attempt to raise and preserve try but fail to preserve these claims Dr. Allen's testimony regarding Mr. Fuller's alleged propensity for future dangerousness. Thus, if the Court finds that such a failure occurred, and that the underlying claim has merit, the ineffective assistance of counsel in this respect has been established. S*trickland v. Washington,* 466 U.S. 668, 686 (1984)

Moreover, the admission of the junk science into the penalty hearing wholly undermined its reliability, especially in a case such as this where the evidence of future danger was scant indeed, and it surely undermined the heightened reliability requirement of the Eighth Amendment, see *Ford v. Wainright*, *supra*, thereby establishing prejudice.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*.  Such review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts.  *See generally* 28 U.S.C. § 2254(d)(1) & (2).   In this case, the state court ruling fits within both rules.  Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No. 9.**

**The Texas Death Penalty Statute, Article 37.071, of the Texas Code of Criminal Procedure, in effect at the time of the offense, violated the Cruel and Unusual Punishment Clause of the Eighth Amendment, the Equal Protection Clause  and  Due Process Clause of the Fourteenth Amendment to the U.S. Constitution by failing to provide jurors with the option of life in prison without parole.**

Mr. Fuller was tried under the former version of Article 37.071, of the Texas Code of Criminal Procedure which did not provide for a sentence of life without parole.  Fuller contends that the Texas capital sentencing scheme in effect at the time failed to comply with the Constitution because it did not provide jurors with the option of sentencing a defendant to life in prison without the possibility of parole.  The lack of life without parole option violated the Cruel and Unusual Punishment Clause of the Eighth Amendment, the Equal Protection Clause  and Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.  In support of this claim he incorporates herein by express reference all pleadings and documents filed in state

court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

The Defense filed a motion to quash the indictment. (C.R. vol. 2 at 315, 319.) Citing the constitutional bases, the motion separately asked that "the State be precluded from imposing any sentence of death resulting from a prosecution based thereon: ..." (C.R. vol. 2 at 316.)   The motion was denied, C.R. ,vol. 2 at 361, 366, 367, 368.  This request is sufficient to preserve review on the merits.

When *Jurek v. Texas*, 96 S. Ct. 2950, 2954 (1976), was decided the necessity for a life without parole sentencing option was not considered by the Court. However, even in the 1970s there were ten states which provided life without parole as a sentencing alternative to the death penalty in capital cases.[1]  Since that time standards of decency have evolved to require that capital juries have available a sentencing option of life without parole.  Life without parole is now a sentencing option in serious murder cases in 31 out of 31 other death penalty jurisdictions in America.

Legislative action, uniform in its direction and overwhelming in numbers, has demonstrated a national consensus in favor of death sentences only being imposed where a jury has the opportunity to make a reasoned moral response to the offense and the offender through a choice between death and life without parole. A national consensus has now developed requiring that a sentencer in a capital proceeding have available the option of life without parole in order to make an accurate individualized determination of moral culpability and the appropriate punishment.  The imposition of a sentence of death by a sentencer in the absence of a reasoned

---

[1] Kentucky, Nebraska, Nevada, New Hampshire, South Dakota, Illinois, Arkansas, Maryland and California. Delaware had provided life without parole since 1953

moral decision to discard an available alternative option of life without parole is unconstitutional as it fails to comport with the standards of the Eighth Amendment. Fuller's sentence was imposed without the available option of life without parole.  His execution would violate the Eighth Amendment.

There is no question that the Eighth Amendment concerns itself as much with the procedures for imposing the death penalty as with the penalty of death itself.  The opinion[2] of the Court in *Furman* focused on the procedures by which convicted defendants were selected for the death penalty rather than on the actual punishment inflicted. *See Furman v. Georgia*, 408 U.S. 238 (1976) (broad, unguided discretion in making a capital sentencing decision violates the Constitution.)

The question whether death sentences are imposed under procedures that violate constitutional standards has been at the heart of Eighth Amendment jurisprudence in the modern era of the death penalty.  *See. e.g., Gregg v. Georgia*, 428 U.S. 153 (1976) (Georgia capital sentencing scheme passed muster where it focused the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant, permitted consideration of any aggravating or mitigating circumstance, and required a finding of at least one statutory aggravating circumstance before the imposition of a death penalty verdict); *Woodson v. North Carolina*, 428 U.S.  280,  303  (1976) (mandatory death penalty scheme unconstitutional because it failed to provide for the "particularized consideration of relevant aspects of  the character  and record  of  each convicted  defendant  before the imposition upon him of a sentence of death.")

A  national  consensus  has  now  developed  requiring  that  a  sentencer  in  a  capital

---

[2] Taking the opinion of the court to be that of the narrowest concurring judges.

proceeding have available the option of life without parole in order to make an accurate individualized determination of moral culpability and the appropriate punishment.    In comparing the national consensus that has developed on this issue with the indicia of national consensus found in other circumstances the case for consensus is overwhelming.

 By 1980, when the reintroduction of the death penalty had stabilized, ten states had a sentencing alternative of life without parole.   Only five[3] more had joined this group by 1986,[4] but since that time twenty two more states have amended their death penalty schemes to provide a sentencing option of life without parole.[5]  At the time of writing only one state fails to provide life without parole as an option and that state is New Mexico. New Mexico has two people on death row and the state has executed only one person since 1976.  Rather than a measure to add life without parole, the New Mexico legislature has been actively considering legislation abolishing the death penalty altogether.  In Spring 2005 the New Mexican House voted in favor of an abolition bill, which then passed out of a Senate committee, but died on the Senate floor. New Mexico's position should not be regarded as detracting from the clear national consensus.

The importance of the adoption by Texas of life without parole as an alternative in capital sentencing proceedings cannot be overstated in confirming a national consensus. While Texas is only one state, it is over represented in the proportion of executions conducted each year in this country. With the adoption of life without parole by the Texas legislature a national   consensus has developed of even greater significance than that in *Coker*.[6] This national consensus can be

---

[3] Pennsylvania, South Carolina, Alabama, Missouri, Connecticut

[4] This was the year the 5th Circuit decided *Andrade v. McCotter*, 805 F.2d 1190 (5th Cir.1986) (sentencing option of life without parole not required). The court in Andrade did not undertake any analysis of the type described in the Supreme Court's eighth Amendment jurisprudence but, in any event, the landscape has shifted significantly since then.

[5] Three more in the 1980s (Oklahoma, Louisiana, Oregon), fourteen more in the 1990s and four more in the last four years.

[6] Here only one state does not have life without parole, .but far from actively seeking death sentences, New Mexico is on the brink of abolition.  In Coker, Georgia may have been the only state with a functioning capital rape statute but it

compared to the consensus recognized in respect of the mentally retarded and juveniles as summarized by the Court in *Simmons and Atkins*.

Significant is not only the fact that legislatures have adopted life without parole but also the overwhelming support such legislation has received. To take Texas as an example, both  the senate (26:5) and the house (121:2) passed the life without parole bill by an overwhelming majority.  In introducing the bill in Committee the bill's author, Senator Lucio, advised that a poll of Texans showed that 78% favored the introduction of life without parole.[7]  In May 2005, the 2005 Houston Area Survey showed a decline in support for the death penalty and an increase in support for life without parole as an alternative to execution .Local support for the death penalty continues to decline, with 60 percent supporting capital punishment for convicted murderers this year compared with 62 percent in 2003, 64 percent in 200 I and 68 percent in 1999.  Meanwhile, support for a life sentence without possibility of parole as an alternative to execution- an option that does not exist in Texas- increased to 64 percent this year from 57 percent in 2003 and 54 percent in 2001.  *See* Snyder, Mike, Houston Chronicle, May 6, 2005 Section B, p.5.[8]  Members of the Supreme  Court have commented  in the past on the poll data supporting the life without parole option and  recent  academic  review  of the  topic  confirms  that poll  data  shows support  and  an increase in support  for life without parole.[9]

Supporting   his claim  that  the 8th Amendment's prohibition  on cruel and  unusual punishment,  along with the evolving standards of decency, require the state to give the jury the

---

was actively pursuing death penalties and had support in other states, though their death penalty schemes were at that time suspended.

[7] Committee Proceedings, 3/15/05.

 Available at http://www.senate.state.tx.us/75r/Senate/commit/c590/c590.htm.

[8] The Houston Area Survey polls members of Harris County, the County in which Mr. Thacker was tried and sentenced to death and a County with a record as one of the most prolific death penalty jurisdictions in the country.

[9] *Brown v Texas*, 522 U.S. 940 (1997) (Stevens, J); Steven J. Mulroy, Avoiding "Death by Default": Does the Constitution Require a "Life Without Parole" Alternative to the Death Penalty? 79 Tul. L. Rev. 401,451.

option to sentence a defendant  to life without the possibility of parole, Fuller points out that 37

of the 38 death penalty jurisdictions, now require such a provision.  Moreover, Fuller contends

that the movement has occurred with considerable force since *Simmons v. South Carolina* in

1994, and was ratified ultimately by the Texas Legislature when it amended the legislation to

require such an option.

Moreover,  Fuller contends that polling  data supports  his view that a supra  majority of

public  prefers  the availability  of a life without  parole  option,  and  that a majority  of

individuals would vote for life if life without the possibility of parole was an option.   Fuller also

argues that evidence exists which describes the impact when the State provides that the only

available  mechanism  to  incapacitate  an  offender  is  a  sentence  of  death.   See  *e.g.,*  Bowers,

William J. & Benjamin Q. Steiner, *Death by Default: An Empirical Demonstration of False and

Forced Choices  in Capital Sentencing*, 77 Tex. L. Rev. 605, 611  n.22, 627 (1999).

The forced choice created by sentencing in the absence of a life without parole option

violates the Supreme Court's holding in *Beck v. Alabama*, 447 U.S. 625 (I980). In *Beck v.

Alabama*, the Court  rejected  a death  penalty  scheme  based  upon  Eighth  and  Fourteenth

Amendment  grounds,  that required a jury to acquit the defendant  or sentence  him to death,

finding  that a jury might be unconstitutionally coerced  to sentencing a defendant  to death

whom it might otherwise convict and impose a lesser sentence.  Beck v. Alabama, 447 U.S.625

(1980).

Similar analysis applies here, particularly given the refusal of the trial court to allow the

jury to be informed that Fuller would have been required to serve at least 35 years in n if not

sentenced to death.  Jurors in general and jurors in Fuller's  trial assumed that he would be

eligible for release after a few years after serving 40 years, and were put in the forced choice of an excessive death sentence or the risk of a sentence that was too lenient and to protect the community or staff in the prison.

Evidence of length of incarceration obviously mitigates against a death penalty and no more so than under the Texas sentencing scheme where jurors must assess future dangerousness and then consider whether any mitigating evidence warrants a sentence less than death - the nature of the available sentence less than death will control whether the mitigating evidence is sufficient to tip the scales. To deny a defendant the opportunity to present constitutionally relevant evidence in mitigation of the death penalty, mitigating evidence that is now available in every state but New Mexico, is to deny his Due process and Equal Protection  Rights.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*.  Such review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts.  *See generally* 28 U.S.C. § 2254(d)(1) & (2).   In this case, the state court ruling fits within both rules.  Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No. 10**

**The state has not disclosed to Mr. Fuller all exculpatory and mitigating evidence in the hands of the prosecution team. Mr. Fuller has been prejudiced in that a range of important items were withheld or not disclosed that were exculpatory or mitigating in nature, and thus not produced for his trial counsel.  [Brady v. Maryland, 373 U.S. 83 (1963); Kyles v. Whitley, 514 U.S. 419 (1995); Banks v. Dretke, 124 S.Ct. 1256 (2004)]**

51

At the time of Mr. Fuller's trial, Texas courts and prosecutors were operating under an erroneous understanding of the law with regard to the nature and scope of constitutionally protected mitigating evidence for sentencing purposes in a capital trial.  Prior to the Supreme Court's decision in *Smith v. Texas*, 543 U.S. 37 (2004), the parties and the judge of the convicting court operated under an erroneous legal view that in order for a circumstance to mitigate against capital punishment, there must be some connection or nexus to the commission of the crime, and that the circumstance must be thought to have considerable mitigating effect. *Smith v. Texas*, *supra,* decided some months after the verdict in this case dispelled these long held notions in no uncertain terms.  For this reason, the prosecution failed to disclose evidence and information to the defense with the proper understanding of the scope of mitigating or favorable evidence, in violation of its duty to disclose under *Brady v. Maryland* and related cases.  These actions violated Mr. Fuller's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.  In support of this claim he incorporates herein by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

By July 2004, when the verdict was returned in this case, the *Smith* decision made clear that Texas defendants may present evidence in mitigation that they lacked the *mens rea* to do the crime or did not act voluntarily on the occasion in question.  Such evidence would include evidence of addiction and intoxication, voluntary or not.

 All such potentially favorable evidence for sentencing purposes comes within the familiar discovery rules set for in *Brady v. Maryland*, 373 U.S. 83 (1963) and related cases. *Brady* held that suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good

faith of the prosecution.  *Kyles v. Whitley*, 514  U.S. 419 (1995) reversed a conviction and death sentence where the state withheld eyewitness and informant statements, and a list of license numbers.  Withheld evidence is to be evaluated collectively, not item-by-item, and the standard is a "reasonable probability" of a different result.  The Court in *Kyles* also made clear that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." 514 U.S. at 437.

In *Banks v. Dretke*, 124 S.Ct. 1256 (2004), the Supreme Court held that a Texas death row inmate was entitled to habeas relief from his death sentence due to the prosecution's suppression of evidence of a trial witness's informant status where that witness's testimony was key to the prosecution's claim of future dangerousness and the witness was not otherwise effectively impeached.  Petitioner had established cause for his failure to present the evidence establishing the *Brady* violation at any point during the state court proceedings because he reasonably relied on the government's pre-trial promise to disclose all *Brady* material, and the state had continued to deny that the witness was informant at state post-conviction proceedings.

In the present case, law enforcement responding to the emergency call to the scene of the offense confronted Mr. Fuller at his home in the interval before his arrest, and likely have evidence that Mr. Fuller was highly intoxicated during that time.  Furthermore, upon information and belief, it is highly likely that police interviewed Joanne K. Fuller, Mr. Fuller's mother, and learned of significant mitigating information that they did not disclose to the defense.  The same can be said with respect to the likelihood that members of the prosecution team interviewed neighbors, friends and more distant family members of Mr. Fuller in an effort to gather evidence of extraneous conduct, and, in that effort, discovered evidence of an exculpatory nature that was not disclosed to the defense.

Mr. Fuller has attached a page from the jail booking records generated at the time he was booked into jail in this case.  The page is an interview form completed by the jail staff during the booking process.  The form contains a series of questions to be asked of incoming jail detainees.  One of these questions is whether detainee hears voices or noises that others do not seem to hear.  On Mr. Fuller's form, it is incomplete in that this question has not been answered.  The failure to complete this jail form suggests that the prosecution team, which includes jail personnel, had information that would have been favorable to Mr. Fuller's defense at trial.  Fuller may well have been exhibiting auditory hallucinations at the time of his arrest, as the record makes clear that he had auditory hallucinations prior to and in the time leading up to his arrest.

 Of course by its nature, undisclosed *Brady* is not known to the defense.  Thus there may well be substantial other mitigating evidence with the prosecution knew or should have known and yet failed to disclose to the defense.  Mr. Fuller thus moves this Court for discovery and an evidentiary hearing to determine whether any additional exculpatory or mitigating evidence in the hands of the prosecution team was not disclosed to Mr. Fuller's trial counsel, and, upon such hearing,  for a writ of habeas corpus granting relief from his conviction and sentence.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*.  Such review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts.  *See generally* 28 U.S.C. § 2254(d)(1) & (2).   In this case, the state court ruling fits within both rules.  Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No. 11**

**The special sentencing issue asking jurors to weigh mitigating circumstances against aggravating circumstances violates the Cruel and Unusual Punishment  Clause of the Eighth Amendment  and Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because it does not provide a means for jurors to give effect to the mitigating circumstances warranting a life sentence, it shifts  the  burden  of  proof to the defendant to prove that sufficient mitigating circumstances exist to warrant a life sentence and it does not require jurors to consider mitigating circumstances alone in determining whether a life sentence is warranted.**

The special sentencing issue asking jurors to weigh mitigating circumstances against aggravating circumstances violates the Cruel and Unusual Punishment  Clause of the Eighth Amendment  and Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because it does not provide a means for jurors to give effect to the mitigating circumstances warranting a life sentence, it shifts  the  burden  of  proof to the defendant to prove that sufficient mitigating circumstances exist to warrant a life sentence and it does not require jurors to consider mitigating circumstances alone in determining whether a life sentence is warranted. In support of this claim he incorporates herein by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

The special issue on mitigation forces jurors to weigh the aggravating circumstances against mitigating circumstances, without informing them that such is their task.  Nor are jurors told the process by which they are to work through this weighing process.  Although the court told jurors to consider all of the evidence, the court's  charge then limited jury consideration of mitigating evidence to just four categories: (1) Fuller's "background," (2) Fuller's "character," and (3) "circumstances of the offense," or (4) record. The jury was never told how to weigh this evidence against the aggravating factors found in the first special issue, and the circumstances of the offense.

55

When the jurors turned to the first special issue, they were asked to decide whether Fuller was probably going to be violent in the future. This question also by necessity requires the jurors to sift Fuller's actions and weigh them against mitigating events or circumstances which would affect his willingness to use violence in the future, such as abstinence from alcohol use, his age, his age when paroled, his level of intelligence, the nature of his upbringing, his lack of aggression in jail and prison, his religious beliefs, and so forth.

So consequently, by the time the jurors even reach the second special issue on mitigation, they have considered and rejected all of the defendant's mitigating circumstances. What they need at this stage is a special issue which compels them to *consider the mitigating circumstances alone*, without any reference at all to the aggravating circumstances of the crime or his past conduct.   Otherwise, the mitigation issue is moot.  How could the jurors suddenly find in special issue number two that they were wrong in special issue one?

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase.  *See. e.g. Walton v. Arizona*. 100 S. Ct. 3047, 3055 (1990) (State's method of allocating the burdens of proof during capital sentencing phase cannot "lessen the State's burden, to prove the existence of aggravating factors").  In order to understand why *Walton* applies to the statutory "Penry" special issue, this Court must recognize that this special issue is a conduit for aggravating (as well as mitigating) factors. By asking jurors to determine whether there are "sufficient ...mitigating circumstances," Tex. Code Crim. Pro. Art. 37.071, Sec. 2(e), the statutory special  issue in effect tells jurors to consider any possible aggravating  factors that may outweigh the mitigating  factors present in the case.  Although the statute does not explicitly use the term "aggravating circumstance," clearly that is how a reasonable juror would interpret the statute. *Johnson v. Texas*, 113 S.Ct.

56

2568 ( 1993) (describing juror's determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances). Because the statute is silent about whether either the State or the Defense has the burden of proof on aggravating factors, and moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances is on the Defense, the statute violates the Eighth and Fourteenth Amendments.

Another problem with the mitigation special issue is that it required Fuller to prove that he should receive a life sentence. The special issue imposed the burden on him to show jurors that sufficient mitigating circumstances outweighed all of the aggravating ones associated with his two crimes and justified a life sentence. To be sure, the special issue does not say that the burden of proof is on the defendant. Nor does it use the term "aggravating circumstances." Nevertheless, the effect is real.

Article 37.071 mentions nothing about the burden of proof on the mitigation special issue. There is no question, however, that the question is designed to place the burden on the defendant. First, the special issue uses the word "sufficient." Jurors must find that there is "sufficient" evidence of a mitigating circumstance to warrant a life sentence. By its nature, for there to be "sufficient" mitigating evidence, it must be the defendant who brings it.

An additional problem with the mitigation special issue is that it provides no mechanism for the jury to vote in favor of a life sentence if truly desired. The special issue places no legal limitation on what circumstances are considered mitigating. Moreover, jurors are instructed to consider all mitigating evidence without reference to the other special issue. In addition, scarcely any of the terms are defined. Also, "mitigating circumstances" are defined as limited only to those which reduce the defendant's "moral blameworthiness," another term left undefined. In

addition, the jurors are left to guess the proportion by which they are to weigh mitigating circumstances against aggravating circumstances. Finally, jurors are not told that they are required to weigh aggravating circumstances, although that is actually what they are asked to do.

Consequently, there may be a juror who finds that a life sentence is warranted; even though he feels mitigating circumstances do not outweigh aggravating ones. There may be a juror who feels mercy, or compassion, or religious views, or the man's chances for salvation or rehabilitation should call for a life sentence, notwithstanding all he has learned about the ugly aspects of the crime.  Such a juror, however, will find that there is no means of giving effect to his decision by writing "yes" to the mitigation special issue.

**Claim No. 12**

**The Texas Death Penalty Statute, Article 37.071, of the Texas Code of Criminal Procedure, violates the Cruel and Unusual Punishment Cause of the Eighth Amendment and the Due Process Clause of the 14th Amendment to the U.S. Constitution by limiting jurors to "relevant" mitigating circumstances, thereby creating an unconstitutional nexus requirement condemned by Smith v. Texas and Tennard v. Dretke.**

Article 37.071 of the Texas Code of Criminal Procedure violates the Cruel and Unusual Punishment Cause of the Eighth Amendment and the Due Process Clause of the 14th Amendment to the U.S. Constitution by limiting jurors to "relevant" mitigating circumstances, thereby creating an unconstitutional nexus requirement condemned by *Smith v. Texas* and *Tennard v. Dretke*.  In support of this claim he incorporates herein by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings. In addition, he presents the following in support of this claim.

In these issues Fuller challenges the redefinition of mitigating circumstances  to "relevant" mitigating circumstances, thereby unconstitutionally constricting the jury's consideration of mitigation which might warrant a life sentence.

58

These issues were preserved by written objection to the charge at R.R. vol. 2 at 415-416 (nos. 26-28), and overruled at 427.   The objection was specifically to the phrase "relevant mitigating circumstances," which appears in the jury charge at R.R. vol. 2 at 429. He also filed a motion challenging the constitutionality of the mitigation issue on this point, C.R. at 341, asking that his jurors be permitted to consider all mitigating evidence without limitation.   The motion was denied at C.R. 358.

The problem is that notwithstanding the broad language of the mitigation special issue, jurors were instructed to limit their consideration of mitigating circumstances to only those which were "relevant:"

> In determining your answers to the questions, or special issues, submitted to you, you shall consider all the evidence submitted to you in this whole trial.

> You shall consider all evidence submitted to you during the whole trial as to the defendant's background or character or the circumstances of the offense that militates for or mitigates against imposition of the death penalty.

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all *relevant* mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant.  A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case.  If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration     to them in assessing the defendant's personal moral culpability at any time you answer the special issue.  If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by an affirmative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, an affirmative finding should be given to that special issue under consideration.

(C.R. at 428-29) (emphasis added.)

The term *relevant* is a restrictive term which permitted, or even forced, jurors to limit their consideration of some mitigating evidence and disregard other mitigating evidence.

Difficulties abound.  First, one must ask, "Relevant to what?"  Second, one must ask by what standards jurors are to know what mitigating evidence is relevant and what is not.  Third, jurors must ask how they should respond if some jurors find a particular mitigating circumstance relevant while other jurors do not.

This phrase "relevant mitigating circumstances" is unconstitutional on several levels. First, all mitigating circumstances are relevant, although jurors may not know this. Therefore, the limitation of mitigating circumstances to only those which are classed as "relevant" constitutes a subtle form of a nullification charge; forcing jurors who might have voted for life from doing so because the mitigating circumstance found important by the juror must discarded because it is not deemed sufficiently "relevant." Second, the restriction of mitigating circumstances to those which are relevant instructs jurors to apply the same sort of nexus requirement to the mitigating evidence offered by the capital defendant, which is now constitutional error under *Tennard v. Dretke*. 124 S. Ct. 2562 (2004, and *Smith v. Texas*, 125 S. Ct. 400 (2004).

**A. Some of Fuller's Mitigating Evidence May Have Been Considered Irrelevant and Therefore Excluded by Jurors From Consideration.**

The trial court did not exclude any mitigating evidence offered by Fuller.   The following mitigating evidence, however, was likely considered irrelevant by jurors as a result of the court's limiting instruction to consider only *relevant* mitigating evidence:

- Fuller's voluntary intoxication;
- Fuller's long abuse of drugs and alcohol and their effect on his brain, perception and judgment, and Fuller's increasing delusion;
- Fuller's age of 45;
- That Fuller would be incarcerated in a maximum security unit for at least 40 years;
- That punishment  of life in prison would be harsher than execution;
- Fuller's anti-government views;
- Fuller's anti-authority view;

- Fuller's distorted religious beliefs;
- The impact of Fuller's execution on his wife, daughter and extended family.

It would be difficult for jurors to consider the impact of Fuller's execution on his family as relevant to his "personal moral culpability" or "moral blameworthiness" because the impact on others falls outside of those restrictive boundaries.  Neither Fuller's daughter, wife, father nor sister explained how Fuller's execution would affect them, but jurors surely considered the effect of his execution.  Even his longsuffering wife and daughter saw some virtue in Fuller to have remained with him so long and to still obviously care for him, and it must have caused jurors pause whether to execute Fuller to save them further pain, until the jurors realized that their feelings were not "relevant" to the special issue.

The same would be true for the other mitigating circumstances, such as Fuller's weird anti-government views, or his strange religious beliefs, or his deteriorating mental condition fostered by years of drugs and alcohol.  Each of these would have been initially considered by jurors who might have thought that Fuller was dangerous, but at the same time also difficult, strange, impersonal, eccentric, and therefore someone worthy of pity rather than execution.  But then one by one each consideration would have been cast aside by jurors once they realized that each hesitation was not "relevant" to his moral  blameworthiness or personal moral culpability, because they were circumstances which he indirectly created.

Similarly, that he would spend 40 years in prison and the Parole Board would not even think about his file until he was 84 would certainly constitute a mitigating circumstance, but unfortunately  one beyond the scope of the mitigation issue because it is screened  out as not "relevant" to Fuller's blameworthiness or culpability.  Other jurors would likely have felt unable to give effect to their own view, commonly  held, that a life time in a prison cage is worse than being put to sleep, because again maximizing punishment  is not "relevant" to the constrictions

of the mitigation special issue.

      B.      ***Tennard and Smith Require Consideration of All Mitigating Evidence, Not Merely That Which is Considered Relevant to Moral Culpability or Moral Blameworthiness***.

*Tennard* explicitly rejects this Court's prior test of constitutional relevance, confirming that mitigating evidence falls within the Eighth Amendment's individualization requirement if any sentencer could reasonably deem such evidence to support a sentence less than death.  In so holding, the Supreme Court insisted that state schemes must provide an adequate vehicle for sentencers to consider and give effect to any evidence that meets this "low threshold." 124 S. Ct. at 2570.

*Tennard* and *Smith* plainly reject the two central arguments that have been previously invoked to deny *Penry* relief to capital appellants: that their evidence was not constitutionally mitigating and that the nullification instruction in any event cured the defects of the former special issues.

*Tennard* held that the nexus requirements long imposed by the Court of Criminal Appeals and the Fifth Circuit had "no foundation" in the decisions of the Supreme Court, 124 S. Ct. at 2570, and confirmed a broad view of relevant mitigating evidence.  According to *Tennard,* mitigating evidence is constitutionally relevant so long as the "sentencer could reasonably find that it warrants a sentence less than death," *Id,* (*quoting McCoy v. North Carolina*, 494 U.S. 433, 441 (1990)), regardless of its severity or connection to the crime.

Under *Tennar*d, Fuller's evidence of his impairment by alcohol and drugs and the impact an execution would have on his family is relevant to a global assessment of whether Fuller should be executed. Indeed, Fuller's mitigating evidence reflects precisely the sort of evidence that the Court in *Tennard* highlighted as impermissibly screened out by the severity and  nexus

tests: "[m]ost obviously,  the test will screen out any positive aspect of a defendant's character, because good character traits are neither 'handicaps' nor typically traits to which criminal activity is 'attributable.'" 124 S. Ct. at 2570.  In addition, evidence that Fuller's mind is Damaged by drug and alcohol, and that he holds anti-government and bizarre religious views reflect on Fuller's general culpability.  Reasonable jurors could well conclude that a defendant who has endured such hardships caused by a damaged mind is less deserving  of  the  ultimate sanction,  even though such; evidence  might constitute an aggravating factor suggesting that he would be dangerous in the future.  Similarly the impact of execution on innocent family members such as his wife; and daughter might constitute a circumstance making Fuller less deserving of the death penalty. *See Hitchcock v. Dugger*, 481 U.S. 393, 397 (1 987) (defendant entitled to have sentencer consider, inter alia, fact that he "had been one of seven children in a poor family that earned its living by picking cotton").

Although the State will argue that some of Fuller's mitigating evidence might have been given some mitigating effect through the special issues, such as evidence of Fuller's voluntary intoxication, such a position would ignore the remainder of Fuller's mitigating evidence that finds no home within those inquiries. In this respect, the State's position would clearly affront *Smith's* declaration that state capital sentencing schemes must provide an adequate vehicle for the consideration of "*all* of the evidence" relevant to the sentencing determination.  125 S. Ct. at 406 (emphasis in original).

The Supreme Court emphatically rejected the State's argument that "some consideration" of Smith's mitigating evidence would satisfy *Penry I*. The fact that Smith might learn to control his behavior *despite* his impairments did not make the future dangerousness question itself an adequate vehicle for considering his impairments, because that question "had little, if anything,

to do with the mitigation evidence petitioner presented."125 S. Ct. at 407.  Because the special issues failed to permit "*full* consideration" of the relevant mitigating qualities of Smith's evidence, including his evidence of a troubled background, his death sentence was unconstitutional.

Like the evidence in *Smith*, Fuller's mitigating evidence of such matters as his anti- . government views and unorthodox religious beliefs, the fact that he would be locked up to age 84 at least, required a separate vehicle from the dangerousness inquiry, and from the limited "relevant"  mitigation question, to receive "full" consideration.   Jurors otherwise persuaded of his dangerousness might have concluded that he did not deserve to die because he could be controlled in prison, and the central lesson of *Tennard* and *Smith* is that jurors must not be precluded from expressing and giving full effect to that conclusion.  The effect of the relevance restriction is to permit or encourage jurors to exclude legitimate mitigating evidence, because it is not relevant to the four categories permitted. *See Eddings v. Oklahoma*, 455 U.S. 104 (1982)

It is a separate question whether *Tennard* and *Smith* undermine Circuit and Court precedent regarding the adequacy of the special issues for certain types of mitigating evidence. Even though the Supreme Court did not understand its decisions in *Tennard* and *Smith* to depart from its *own* prior precedents, it clearly understood both decisions to overrule longstanding erroneous interpretations by lower courts in the *Penry* context.  Hence, the fact that the Court viewed the results in *Tennard* and *Smith* as firmly rooted in its own decisions 'cannot  fairly be read as countenancing anybody of *Penry* law developed  in this Circuit or in the Texas Court of Criminal  Appeals.

Moreover, the Court in *Smith* repeatedly and unequivocally embraced a standard for reviewing *Penry* claims that the Fifth Circuit's and this Court's Penry decisions have rejected.

The very first paragraph of *Smith* requires sentencing instructions to allow jurors   to   give   "*full* consideration and *full* effect to mitigating circumstances."25 S. Ct. 401 (emphasis in original) (internal citation and quotation marks omitted).  In fact, in announcing its adherence to the "*full* consideration and *full* effect" standard, the Court was quoting from Justice O'Connor's dissenting opinion in *Johnson*, an opinion the Court cites repeatedly for that proposition. See 125 S. Ct. at 406.  In this respect, Smith is not the first case to call into question  Johnson's  suggestion  that "some" consideration of mitigating  evidence  satisfies *Penry I*. Justice O'Connor's opinion in *Penry II* likewise quotes from her dissent in *Johnson* to emphasize  the "*full* consideration and *full* effect" standard. 532 U.S. at 797. *Smith* also cites *Penry II* for another critical proposition in this case, that sentencing instructions must not only permit full consideration of mitigating evidence, but also they must do so for "*all*" of a defendant's mitigating evidence. 125 S.Ct. at 406 (emphasis in original) (quoting 532 U.S., at 796).

Overall, Justice O'Connor's  views  about  *Penry* until recently clearly commanded a majority of the Court.  Indeed, Chief of Justice Rehnquist, who argued in dissent that *Johnson's* "some effect" standard should have precluded relief in *Tennard*, 124 S. Ct. at 2574 ("it is clear that the question is simply whether the jury could give *some effect* to the mitigating evidence through the special issues") (citing *Johnson,* 113 S.Ct. at 2658), joined the *Smith per curiam* opinion, with its unequivocal endorsement of Justice O'Connor's "full effect" standard.

Hence, if the State contends that Fuller cannot prevail unless he demonstrates that the jury was altogether prevented from giving effect to his mitigating evidence; it would be making a misstatement of the law after *Smith*.  To insist on the "altogether prevented" standard in the face of the Court's forceful and unambiguous articulation of the "*full* consideration and *full* effect" standard in *Smith* as well as *Penry v. Johnson (Penry II)*, 532U.S. 782,797 (2001) reflects an

unwillingness to accept the clear direction provided by the Supreme Court.

Finally, to the extent the Texas Court of Criminal Appeals ruled on the merits of this claim, this Court is nevertheless duty-bound to review this claim on the merits *de novo*.  Such review is required where the state court ruling on the claim is either based on an unreasonable determination of the facts or an unreasonable application of the law to those facts.  *See generally* 28 U.S.C. § 2254(d)(1) & (2).  In this case, the state court ruling fits within both rules.  Accordingly, federal habeas-corpus relief remains available to remedy the constitutional wrong done to Petitioner Fuller, and *de novo* review on the merits is required.

**Claim No. 13**

**Petitioner is actually innocent of capital murder, and his conviction and sentence violate his federal constitutional rights under the Fifth, Sixth Eighth and Fourteenth Amendments to the U.S. Constitution; to the extent his trial attorneys failed to properly investigate, develop, preserve and/or present this defense, they were ineffective, in violation of Mr. Fuller's rights under the same constitutional provisions.**

Petitioner is actually innocent of the crime of capital murder.  For this reason, his convictions and sentence of death are in violation Mr. Fuller's constitutional rights as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.  His trial counsel were also ineffective for any perceived failure adequately to preserve this defense by investigating, developing and presenting it at trial.  In support of this claim he incorporates herein by express reference all pleadings and documents filed in state court, at trial, on direct appeal, and in state habeas corpus proceedings.  In addition, he presents the following in support of this claim.

The record facts in this case establish that Mr. Fuller was not guilty of capital murder. The primary basis derives from the wealth of evidence about Mr. Fuller's mental state before,

during and immediately after the offenses in question.  That mental state rendered incapable of the required *mens rea* for capital murder.

Defenses other than the insanity defense are available to Texas defendants who were unconscious or semi-conscious at the time of the alleged offense.  *Mendenhall v. State*, 77 S.W.3d 815 (Tex. Crim. App. 2002).  Persons who were unconscious or semi-conscious at the time of the alleged offense may argue either that they lacked *the mens rea* necessary for criminal liability; *see* Tex. Pen.Code § 6.02(a), or that they did not engage in a voluntary act; *see* Tex. Pen.Code§ 6.0l(a).  See *Alford v. State*, 866 S.W.2d 619,625 (Tex.Crim.App.1993)(Clinton, J., concurring) ("voluntary" act means conscious act).

Further, Texas recognizes the defense of insane delusions.  SIee *Conaway v. State*, 663 S.W.2d 53 (Tex. App. Hou.-1 1983), citing *Ex parte McKenzie*, 116 Tex.Cr. 144,28 S.W.2d 133 (1930);  *Lowery v. Lowery*, 386 S.W.2d 194 (Tex. Civ. App.--Tyler 1965). *Alexander v. State*, 8 S.W.2d 176_(Tex.Cr.App.l928), recognizing "insane delusion." *See* also *Coffee v. State*, 184 S.W.2d 278 (Tex. Crim. App. 1945).  The record facts here support either legal theory.

 The record evidence here suggests both a lack of consciousness and a delusion on the part of Mr. Fuller.  The trial testimony of Robin Fuller, Linda Fuller, Bonnie Fuller and Barney Fuller, Sr., combined with the bizarre nature of the killings of two next-door neighbors, ostensibly over a relatively trivial dispute, suggest that Mr. Fuller was not adequately conscious of true reality at the time to be criminally responsible for his actions.  Moreover, Mr. Fuller provided additional evidence in state habeas corpus proceedings showing that Mr. Fuller's increasing alcohol and substance abuse, depression, mania, paranoia and delusional thinking and actions, combined with a set of religious beliefs and political views, that engendered and supported his departures from reality into delusion.  *See* the statements of the defense mitigation

investigators based on interviews of relatives, neighbors, and others who knew Mr. Fuller during his childhood and adolescence. (See Petitioner's Exhibits 4, 6, 7, 8, 9, 10, 11, 12, 13 ; Exhibits Articles 4-18).

A life long substance abuser and addict, Mr. Fuller's lack of consciousness  and delusional thinking was no longer the product of voluntary intoxication,  but was involuntary because of physical changes in the brain caused by alcohol, cocaine and other intoxicants over a long period of time. *See*, Articles 4-18)

In her post-conviction affidavit, Robin Fuller recounts how her brother suffered birth-related trauma culminating in a very difficult delivery resulting in serious head wounds to himself and other wounds to his mother.  In addition, further serious head trauma resulted when young Barney was dropped on his head as an infant, resulting in injuries from which flowed a change in personality and behavior for the worse. Petitioner's Exh. 8. (Affidavit of Robin Fuller, January, 2007).  Robin describes her brother as becoming delusional thereafter.  From all that appears in the trial and state habeas record, Mr. Fuller had been entertaining a delusion in which he was defending his family and his home from agents  of the devil at the time of the killings. The trial record shows  that Mr. Fuller referred to the victims as being of the devil,  much as he was called "Satan" by his own parents many years earlier.

This theory is supported by information from the state habeas record showing the long-term results and impact of traumatic brain injury to a child.  The reduced ability to deal properly with stress, reduction in social skills, over-reaction to seemingly trivial problems, and the enhanced  predisposition  toward  other psychiatric illnesses fits, if it does not actually  tell, the life story of Mr. Fuller.  (*See* Petitioner's, Articles 1-3, describing the likely progression and

recommended treatment and accommodation for victims of traumatic brain injury}; *see also* affidavit of Dr. Susan A. Stone, psychiatrist. Petitioner's, Exhibit 1.

Petitioner asserts that the totality of the evidence in the trial and state habeas record establishes that he was not conscious of true reality at the time of the killings, but was instead doing battle with the devil that he saw in his deluded and brain damaged mind.

Federal and state constitutional law permit a criminal defendant to introduce relevant evidence of mental impairment ***in the guilt/innocence phase*** of the trial to negate *mens rea*. At a minimum, the Due Process Clause of the United States Constitution mandates the admission of relevant "observation evidence" of mental impairment, which "can be presented by either lay or expert witnesses." *Clark v. Arizona*, 548 U.S. 735 , 126 S.Ct. 2709, 2724 (2006).

Texas law is even more expansive, permitting a defendant to introduce in the guilt/innocence phase, not only relevant "observation evidence," but also "mental-disease evidence," and "capacity evidence" as well. *Jackson v. State*, 160 S.W.3d 568, 573-574 (Tex. Crim. App. 2005); *Mendenhall v. State*, 77 S.W.3d 815, 818 (Tex. Crim. App. 2002); TEX. CODE CRIM. PROC. 38.36(a) (Vernon 2005).

**1.    Constitutionally protected categories of evidence include "observation evidence," "mental-disease evidence," and "capacity evidence"**

The United States Supreme Court has identified three "categories of evidence with a potential bearing on *mens rea*." *Clark v. Arizona*, 548 U.S. 735, 126 S.Ct. 2709 (2006). In *Clark* the Court wrote:

> First, there is "observation evidence"" in the everyday sense, testimony from those who observed what Clark did and heard what he said; this category would also include testimony that an expert witness might give about Clark's tendency to think in a certain way and his behavioral characteristics. This evidence may support a professional diagnosis of mental disease and in any event is the kind of evidence that can be relevant to show what in fact was on Clark's mind when he fired the gun. Observation evidence in the record covers Clark's behavior at home and with friends, his expressions of belief

> around  the time of the killing  that "aliens" were inhabiting the bodies  of local people (including government agents),  his driving  around  the  neighborhood before  the police arrived, and so on. Contrary to the dissent's   characterization, ...  observation  evidence can be presented by either lay or expert witnesses**.**

*Clark v. Arizona*, 548 U.S. at 757; *see also* 548 U.S. at 758  (regarding any opinion evidence as to  a  defendant's  "mental  disease");  *id.*  at  758  (regarding  expert  opinion  evidence  as  to defendant's capacity to form requisite *mens rea*).

Although it is Petitioner's position that all of these three types of *mens rea*  evidence were and are admissible under Texas rules of evidence, any argument that Texas state law prevented such a defense in this case violates Mr. Fuller's constitutional rights.  A state cannot employ evidentiary limitations to deprive a defendant of a fair trial.  *See e.g., Crane v. Kentucky*, 476 U.S. 683, 690-691 (1986) ("In the absence of any valid state justification, exclusion of this kind of exculpatory evidence [circumstances of confession]  deprives  a defendant of the basic right to have  the  prosecutor's case encounter and survive   the crucible  of meaningful   adversarial testing."); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The  right of an accused  in a criminal trial to due process is, in essence,  the right to a fair opportunity to defend against  the State's accusations."); *Washington v. Texas,* 388 U.S. 14 (1967) (prohibiting the State of Texas from establishing rules to prevent  whole categories  of witnesses  from testifying on the basis of their untrustworthiness).

### 2.     Trial counsel were ineffective to the extent they did not introduce and of these three types of constitutionally protected evidence as to Mr. Fuller's  *mens rea*

To the extent trial counsel failed to investigate, develop and present relevant "observation evidence" of Mr. Fuller, trial counsel were ineffective by denying Mr. Fuller his right to present these  defensive issues to the jury, in  violation of his Sixth Amendment rights.  *Strickland v.*

*Washington*, *supra*.   This failing also deprived Mr. Fuller of his right to present a defense. *California v. Trombetta*, 467 U.S. 479, 485 (1984).

# IV.
## PRAYER FOR RELIEF

WHEREFORE, petitioner Barney Fuller prays that this Court:

1.   Issue a writ of habeas corpus to have petitioner brought before it, to the end that he might be discharged from his unconstitutional confinement and restraint, and/or relieved from his unconstitutional sentence of death;

2.   Order Respondent to Answer this Petition by specifically admitting or denying each allegation and claim made herein;

3.   Conduct an evidentiary hearing at which proof may be offered concerning the allegations in this Petition or any affirmative defenses presented by Respondent;

4.   Permit petitioner, who is indigent, to proceed without prepayment of costs and continue the appointment of counsel to represent him, grant him authority to obtain subpoenas without fee for witnesses and documents necessary to prove the facts alleged in this petition, and grant him sufficient funds to secure the additional expert testimony and investigative assistance necessary to prove the facts alleged in this petition;

5.   Require the Respondent to bring forth the entire state court record, including all exhibits filed by the parties in petitioner's state habeas proceedings, so that this Court can review those parts of the record that are relevant to the issues and defenses raised in this proceedings;

6.   Permit petitioner to file an amended finalized federal petition for writ of habeas corpus after full factual development has been allowed, funded, and conducted;

7.   Permit petitioner to supplement the record in this matter;

8.   Grant and order discovery on any and all claims requiring further factual development after petitioner has had sufficient time to prepare and file a thorough motion for discovery, and thereafter grant an opportunity to develop new facts in light of said discovery, with sufficient investigative funds for such factual development;

9.   Grant such other and further relief as may be appropriate and necessary to dispose of the matter, as justice may require.

Respectfully submitted this _14th___ day of __January_____, 2016.


Respectfully submitted,

_____
Jason D. Cassel
Texas Bar No. 24006970
jdc@emafirm.com
ALBRITTON LAW FIRM
P.O. Box 2649
Longview, Texas 75606
Telephone:  (903) 757-8449
Facsimile:  (903) 758-7397

ATTORNEY FOR THE PETITIONER
BARNEY RONALD FULLER, JR

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the _14th____day of __January____, 2016, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which sent notification of such filing to all counsel of record.

_____

Jason D. Cassel

73

## APPENDIX OF EXHIBITS

1. Affidavit of Dr. Susan A. Stone, M.D

2. Resume of Dr. Susan A. Stone, M.D

3. Grand Jury Testimony of Father, Barney R. Fuller, Sr.,

4. Grand Jury Testimony of Mother, Joanne Fuller

5. Affidavit of Wife, Linda Fuller

6. Affidavit of Daughter, Bonnie Fuller

7. Affidavit of Sister, Robin Fuller

8. Affidavit of Michael Dennis, Mitigation Specialist

9. Affidavit of Karen Kneezle, Childhood Neighbor

10. Affidavit of Curt Fraund, Childhood Neighbor

11. Declaration of Janet Peterson-Caudill, Childhood Next Door Neighbor

## ARTICLES

1. "Traumatic Brain Injury-Acquired Brain Injury." Ohio State University Medical Center, 2006.

2. Boon, Rosemary and Gregory J. de Montfort, "Brain Injury," 2002.

3. Middleton, Judith A., "Brain injury in children and adolescents." Advances in Psychiatric Treatment, 2001.

4. Kalivas, Ph.D., Peter W. and Nora D. Volkow, M.D. "The Neural Basis of Addiction: A Pathology of Motivation and Choice." American Journal of Psychiatry 2005; 162:1403-1413.

5. Jorge, M.D., Ricardo E., et. al. "Alcohol Misuse and Mood Disorders Following Traumatic Brain Injury." Archives General Psychiatry 2005; 62:742-749.

6. Neergaard, Lauran. "Injury to spot in brain seems to erase smoking addiction." Houston Chronicle. 26 January 2007.

7. "Some Brain-damaged Patients Quit Smoking With Ease." Science Daily. 25 January 2007.

8.  Naqri, Nasir H., et. al. "Damage to the Insula Disrupts Addiction to Cigarette Smoking." Science. Vol. 315 No. 5811: 531-534.

9.  Volkow, Nora D., et. al. "The addicted human brain: insights form imaging studies." The Journal of Clinical Investigation, 2003; 111: 1444-1451.

10. Randerson, James. "Gene link may help treat cocaine addicts." Guardian News and Media Limited 2006; 14 March 2006.

11. Rauscher, Megan. "Depressed kids more apt to drink at an early age." Reuters Health. New York. 23 November 2006.

12. Wildenberg, Esther van den, et. al., "A Functional Polymorphism of the u-Opioid Receptor Gene(OPRMl) Omf;iemces Cie-Induced Craving for Alcohol in Male Heavy Drinkers." Alcoholism: Clinical and Experimental Research, Vol. 31 No. 1:1-10.

13. Goldstein, Ph.D., Rita Z. And Nora D. Volkow, M.D. "Drug Addiction and Its Underlying Neurobiological Basis: Neuroimaging Evidence for the Involvement of the Frontal Cortex." The American Journal of Psychiatry. 159:1642-1652, October 2002.

14. Weber, Deborah A. and Reynolds, Cecil R. "Clinical Perspectives on Neurobiological Effects of Psychological Trauma." Neuropsychology Review. Vol.14 No.2, June 2004.

15. Weissman, Ph.D., Myrna M., et. al. "Offspring of Depressed Parents: 20 Years Later." The American Journal of Psychiatry 2006; 163: 1 00 1-1 008.

16. Wulsin, Lawson. "Treating mom's depression helps child, too." Mind Matters. Enquier. 12 January 2007.

17. "Repeat DUIs Associated With Mental Illnesses." Health Day News. 22 September 2006.

18. "Recommendation and Report on the Death Penalty and Persons with Mental Disabilities." American Bar Association as in 30:5 MPDLR. September-October 2006; 668-677.